IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 3:15-cv-243 |
| Plaintiff, ) | |
| ) | Judge Michael P. Shea |
| v. ) | |
| ) | |
| DIANE M. GARRITY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF UNITED STATES'
MOTION *IN LIMINE* FOR AN ADVERSE INFERENCE**

THE PLAINTIFF UNITED STATES OF AMERICA files this memorandum in support of its motion *in limine* for an adverse inference against the Defendants Diane M. Garrity, Paul G. Garrity, Jr., and Paul Sterczala, as the personal representatives of Estate of Paul G. Garrity, Sr. ("the Defendants" or "the Estate"), because two non-parties, Kevin Garrity and Sean Garrity, invoked their Fifth Amendment right not to incriminate themselves and refused to testify with respect to their firsthand knowledge about the formation and use of the foreign account that is the subject matter of this case.[1]  Permitting the government an adverse inference is an equitable remedy here, given Kevin and Sean's close familial and business relationship, including their self-professed roles as "co-conspirators," with the decedent, their father; the compatibility of their interests with the interest of the Estate in defeating the government's financial claim; and their key role as witnesses to and participants in the use of the foreign trust.

---

[1] For the sake of clarity, the government will refer to the decedent, Paul G. Garrity, Sr., as "Mr. Garrity," and his three sons by their given names, Kevin, Sean, and Paul, Jr.

1

**Background**

**1. Mr. Garrity gave his sons an interest in the foreign account.**

The government filed this suit to reduce to judgment a civil penalty assessed against the decedent, Paul G. Garrity, Sr., for his willful failure to report his interest in a foreign account in 2005 (hereinafter referred to as the "FBAR penalty"). *See generally* Compl., ECF No. 1. Mr. Garrity established a foreign trust in Liechtenstein in 1989 called the Lion Rock Foundation; Mr. Garrity designated himself as the first beneficiary of the foreign trust for life and his three sons, Kevin, Sean, and Paul, Jr. as the secondary beneficiaries. *See* **Exhibit A**, By-Laws of the Lion Rock Foundation, Vaduz, dated November 6, 1989.

The foreign trust had a financial account with a Liechtenstein bank—the foreign account held cash and various investment assets (e.g., securities). *See* Answer, ECF No. 9, ¶ 8.

In June 2004, Mr. Garrity travelled to Liechtenstein with Kevin, Sean, and Paul, Jr. Mr. Garrity instructed the foreign trust to provide him with $100,000, and he gave each of his sons $25,000. *See* **Exhibit B**, Request for Distribution, dated June 2, 2004; **Exhibit C**, LGT Bank Receipt for $100,400.00, dated June 2, 2004; Answer, ¶ 15. During the trip, Mr. Garrity also gave his three sons a Power of Attorney with respect to the foreign trust. *See* **Exhibit D**, Power of Attorney, dated June 2, 2004. Indeed, there is evidence that Mr. Garrity had involved Kevin in the foreign trust/foreign account well beforehand—in 1994, Mr. Garrity gave Kevin a Power of Attorney with respect to the foreign trust. *See* **Exhibit E**, Power of Attorney, dated September 28, 1994.

After Mr. Garrity died in 2008, his sons became the first beneficiaries of the foreign trust; they instructed the trust to liquidate the assets held in the foreign account and disburse the proceeds to themselves. *See* Answer, ¶ 8. Each of Mr. Garrity's sons received more than

$300,000 from the liquidation of the foreign account.  *See*, *e.g.*, **Exhibit F**, Letter to Kevin, Sean, and Paul, Jr., from the Lion Rock Foundation, dated January 26, 2009, re: Liquidation.

### 2. Mr. Garrity gave his sons his domestic corporation.

Mr. Garrity was very generous to his sons throughout his life.  In the 1990s, Mr. Garrity gave each of his sons one-third of the outstanding shares in Garrity Industries—the domestic corporation that Mr. Garrity had founded.  Mr. Garrity had brought his sons into Garrity Industries in the 1980s; eventually, Kevin served as president, and Sean and Paul, Jr., served as vice presidents.  Mr. Garrity remained the CEO, even after he gave his sons ownership of Garrity Industries, until the corporation was sold in March 2006.  Each of his sons received approximately $9,000,000 from the sale of their shares.  *See* **Exhibit G**, Receipts, dated March 31, 2006.

### 3. Kevin and Sean are creditors of the Estate and independently stand to benefit from the Estate both directly and indirectly.

After selling Garrity Industries, Kevin, Sean, and Paul, Jr., each loaned Mr. Garrity $1.3 million backed by a promissory note that became payable upon Mr. Garrity's death.  *See* **Exhibit H**, Letter dated April 19, 2006, from Paul Sterczala to Mr. Garrity re: Loans.  The promissory notes provided that "[i]f the amounts due under this Note become payable by the estate of [Mr. Garrity] upon his death, to the extent allowed by law, [Mr. Garrity] agrees that the amounts due under this Note shall be payable prior to any other distributions of the assets of the estate of [Mr. Garrity]." *See*, *e.g.*, **Exhibit I**, Promissory Note, dated March 31, 2006, ¶ 4(d).  Thus, Kevin and Sean (as well as Paul, Jr.) are creditors of the Estate.  Indeed, Kevin and Sean are actively seeking payment on their claims against the Estate in probate court.  *See generally* **Exhibit J**, Motion Seeking Payment of Claims (without attachments).  Of course, their claims against the Estate are subordinate to the United States' claims, i.e., if the Estate is insolvent, then the United

3

States' claims must be paid in full before any other creditor receives a distribution. *See* 31 U.S.C. § 3713(a) ("A claim of the United States Government shall be paid first when … the estate of a deceased debtor … is not enough to pay all debts of the debtor").

However, aside from being creditors of the Estate, Kevin and Sean also stand to benefit from the Estate both directly and indirectly. Indirectly, Kevin and Sean stand to benefit because their children will "inherit" from the Estate. Mr. Garrity left his residuary estate to "The Paul G. Garrity, Sr., Revocable Trust" (hereinafter referred to as the "Revocable Trust"). *See* **Exhibit K**, Will of Paul G. Garrity, Sr., dated October 15, 2007, p.2, Article III. In the Revocable Trust, Mr. Garrity specified that from his residuary estate, the trustees were to distribute enough assets to ensure that the value of "The Paul G. Garrity, Sr. Irrevocable Life Insurance Trust" was equal to $3 million; this life insurance trust is for the benefit of his grandchildren. *See* **Exhibit L**, The Paul G. Garrity, Sr. Revocable Trust, dated October 15, 2007, p. 3, Article 3, ¶ A.

More directly, Kevin and Sean stand to benefit from the Estate because they will receive trusts for life if they survive Diane Garrity, Mr. Garrity's widow. By the terms of the Revocable Trust, the remainder of the residuary assets (after ensuring that the life insurance trust has $3 million) are held in a separate marital trust for the benefit of Mr. Garrity's widow, but she is only entitled to the income from the trust during her lifetime (and up to $500,000 per year of the trust's principal). *See id*., pp. 3-4, Article IV. After Mr. Garrity's widow passes away, Mr. Garrity directed that the principal remaining in the Revocable Trust be held in lifetime trusts for the benefit of his three sons, and then after they pass away, to their heirs. *See id*., pp. 4-6, Article V.

### 4. Kevin and Sean invoked the Fifth Amendment.

Given Kevin and Sean's knowledge of the foreign account, the government subpoenaed each of them for depositions. However, at their depositions, they invoked their Fifth Amendment privilege to every question. The government moved to compel Kevin and Sean to testify. *See* ECF No. 65. In response to the government's motion, counsel for Kevin and Sean argued that invocation of the Fifth Amendment was appropriate because the statute of limitations for criminal conspiracy remained open. *See* ECF No. 71, pp. 4-12. The Court required Kevin and Sean to provide an *ex parte* submission in order to justify their invocation of the Fifth Amendment for an *in camera* review. *See* ECF No. 73. Based on this submission, the Court granted in part and denied in part the government's motion, thereby requiring Kevin and Sean to answer certain questions—if the Court determined that invoking the Fifth Amendment was justified, it "sustained" the objection, but if the Court determined that the Fifth Amendment would not apply, it "overruled" the objection. *See* ECF Nos. 75 and 75-1.

Broadly speaking, the Court sustained Kevin and Sean's objection to answer any question related to the foreign trust (the Lion Rock Foundation) and the Liechtenstein bank (LGT Bank) where the foreign account was held—the very subject matter of this action. *See* ECF Nos. 75 and 75-1. For example, with respect to Kevin's deposition, the Court sustained the objection to questions such as:

- "[A]re you familiar with the Lion Rock Foundation?"
- "When did you first learn of the Lion Rock Foundation?"
- "Did your father ever discuss Lion Rock Foundation matters with you?"
- "Did the Lion Rock Foundation have a bank account at LGT?"
- "Did your father ever discuss the LGT Bank account with you before he passed away?"

- "How was the LGT Bank account funded?"

*See* ECF No. 75, Pages 16-19 of 107.

In addition to sustaining objections on the foreign trust/foreign account, the Court also sustained objections regarding the family business—Garrity Industries. There is evidence that Mr. Garrity used (or at least intended to use) Garrity Industries to fund his foreign account in the Liechtenstein bank. For example, on or about January 15, 1990, Mr. Garrity instructed the Liechtenstein bank to "activate" Kepase Enterprises Ltd.—a sham entity established in the British Virgin Islands; "[a]rrange suitable documentation between Kepase and the Agent for Garrity Industries for Kepase to receive fee payments for inspection services;" and then, "[a]rrange for Kepase to remit funds that accumulate in Kepase accounts when the amounts reach US$50,000 to accounts of Lion Rock Foundation for investment." *See* **Exhibit M**, Letter from Mr. Garrity to BIL [Bank in Liechtenstein] Trehand AG, re: Lion Rock Foundation and Kepase Enterprises Ltd. (Kepase); *also* **Exhibit N**, Trust Agreement re: Kepase Enterprises Ltd., dated January 15, 1990. When the government sought to examine Kevin and Sean regarding whether Garrity Industries was used to fund the foreign account, they invoked the Fifth Amendment.

The Court sustained objections related to the activities of Kepase and Garrity Industries, including:

- "… are you familiar with Kepase Enterprises, Ltd.?"

- "Kepase Enterprises, Ltd., did it perform inspection services for Garrity Industries?"

- "Did your father ever discuss Kepase Enterprises-related matters with you?"

*See* ECF No. 75, Pages 41-42 of 107.  The Court even sustained objections related to Garrity Industries for seemingly innocuous questions, including:

- "Did anyone in your family have a position with Garrity Industries Inc.?"
- "Did you have a position with Garrity Industries?"
- "Who handled the contracts with outside accountants for Garrity Industries?"

*See* ECF No. 75, Pages 4-6 of 107.

Because Kevin and Sean invoked their Fifth Amendment privilege not to answer questions regarding the foreign trust, foreign account, and the use of Garrity Industries to fund the foreign account, the government asks that the Court allow an adverse inference against the Estate for their refusal to testify.

**Argument**

The Court should allow an adverse inference against the Estate because Kevin and Sean invoked their Fifth Amendment privilege and refused to testify.  "'[S]ilence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause.'" *Brink's Inc. v. City of New York*, 717 F.2d 700, 709 (2d Cir. 1983) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)).  Because '[s]ilence is often evidence of the most persuasive character,'" adverse inferences carry significant weight. *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997) (quoting *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923)).  In deciding whether to allow an adverse inference from a *non-party's* invocation of the Fifth Amendment, the Second Circuit has identified four non-exclusive factors that the trial court should consider: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; (4) the role of the non-party witness in the litigation.

7

*LiButti*, 107 F.3d at 123-24.  These non-exclusive factors should be applied "flexibly," *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1311 (11th Cir. 2014), and "[w]hether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."  *LiButti*, 107 F.3d at 124.  In this case, the balance of the *LiButti* factors weigh heavily in favor of allowing an adverse inference.

> **1. Kevin and Sean were bound to Mr. Garrity through familial and business relationships, as well as "co-conspirators" with respect to the foreign account.[2]**

The first factor—the nature of the relevant relationships—strongly favors the adverse inference because Kevin and Sean had close familial and business relationships with Mr. Garrity.  Obviously, Kevin and Sean were closely related to Mr. Garrity in a familial sense because they were his sons.  In addition, Kevin and Sean were Mr. Garrity's business associates, as their father had brought them into Garrity Industries and gifted ownership of the company to them.

However, even more importantly for purposes of the adverse inference, Kevin and Sean were Mr. Garrity's "co-conspirators" with respect to the foreign account at issue in this case.  Mr. Garrity was the first beneficiary of the foreign trust that held the foreign account, but he had designated Kevin and Sean (along with their brother Paul, Jr.) as the second beneficiaries of the foreign trust.  *See* Exhibit A.  Indeed, when Mr. Garrity died, the brothers became the beneficiaries of the foreign trust and "inherited" all the money in the foreign account.  *See* Answer, ECF No. 9, ¶ 8; Exhibit F.  Furthermore, Kevin and Sean travelled with Mr. Garrity to Liechtenstein in 2004, and each received $25,000 from the foreign account.  *See* Exhibits B and

---

[2] To be clear, the United States is not using the term "co-conspirators" as an accusation of criminal conduct.  The United States is merely adopting the language set forth in Kevin and Sean's response to the United States' motion to compel testimony.  *See* ECF No. 71, at pp. 4-12.

C. Thus, Kevin and Sean knew of, and directly profited from, the foreign account that is the subject of this case. Because of these relationships between Mr. Garrity and Kevin and Sean, the first factor weighs heavily in favor of the adverse inference.

The Estate may argue that the Court should not analyze the relationship between Kevin and Sean and Mr. Garrity, but rather, the Court should look to the relationship between Kevin and Sean and the Estate because the Estate is the party-in-interest in this case. However, while the named defendants in this action are the personal representatives of the Estate, the government filed this action to collect on the FBAR penalty that was assessed against Mr. Garrity. Thus, the representatives of the Estate were named merely as successors-in-interest to Mr. Garrity. The fact is that the government is attempting to collect a penalty assessed *against* Mr. Garrity from assets that were *held* by Mr. Garrity; therefore, the relevant relationship for purposes of the adverse inverse is the relationship between Mr. Garrity and his sons—this analysis conforms to the "flexible" approach trial courts should take in applying the *LiButti* factors, *see Coquina Invs.*, 760 F.3d at 1311, and is necessary under the "circumstances unique to [this] particular case," *see LiButti*, 107 F.3d at 124.

Even if the Court were to focus on the relationship between the Estate and Kevin and Sean, the Estate and the brothers still have a "common interest" in prohibiting the United States from collecting on the FBAR penalty, as is discussed in more detail below under the third *LiButti* factor. The bottom line is that the Estate, as well as Kevin and Sean, all benefit if the Estate maximizes its assets by stopping the United States from collecting on the FBAR penalty. The Estate will likely highlight the contentious relationship between Diane Garrity and Paul, Jr., on one side and Kevin and Sean on the other side. Despite these family squabbles, however, it is

9

indisputable that Kevin and Sean are still closely related to the Estate through familial and financial ties.

Still, the Estate will no doubt argue that the adverse inference should not be allowed because Kevin and Sean may just be trying to "set up" their father or hurt the Estate by invoking the Fifth Amendment. The Third Circuit dealt with a similar argument in *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 276 (3d Cir. 1986), where a former employee had invoked the Fifth Amendment and there was a "lack of proof" regarding the former employees' "continuing loyalty to the employer." There, the Third Circuit stated:

> First, a witness truly bent on incriminating his former employer would likely offer damaging testimony directly, instead of hoping for an adverse inference from a Fifth Amendment invocation. Second, the trial judge could test the propriety of an invocation to ensure against irrelevant claims of privilege. Third, counsel may argue to the jury concerning the weight which it should afford the invocation and any inferences therefrom.

*Id*. Likewise, here, if Kevin and Sean were attempting to hurt their father or the Estate, they could do far worse by offering damaging testimony as opposed to hoping that the Court would allow an adverse inference. Moreover, this Court has already tested the propriety of Kevin and Sean's invocation of the Fifth Amendment and found that they were within their rights. *See* ECF Nos. 75 and 75-1. And there is nothing preventing the Estate from arguing to the jury that it should give no weight to the adverse inference.

### 2. The Defendants do not control Kevin and Sean.

Admittedly, the second factor does not lean toward the adverse inference; however, it is important to note that the test is a balancing among the factors, and not all factors need be present for an adverse inference. *See*, *e.g.*, *Coquina Invs.*, 760 F.3d at 1311 ("Three of the four *LiButti* factors counsel in favor of the trustworthiness of the adverse inferences …"); *Encana Oil & Gas (USA), Inc. v. Zaremba Family Farms, Inc.*, 2016 WL 7971983, at *6 (W.D. Mich. Apr.

11, 2016) (finding that the adverse inference was trustworthy even though the "the second factor does not weigh in favor" because the third and fourth factors "weighed heavily" and the first factor "weighed slightly" in favor of the adverse inference").

### 3. Kevin and Sean have common interests with the Estate and Mr. Garrity.

The third factor regarding "compatibility of interests" strongly favors the adverse inference. In applying the third factor, "the trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *LiButti*, 107 F.3d at 123. Here, Kevin and Sean have a common interest with the Estate in prohibiting the government from collecting on the FBAR penalty. Kevin and Sean are creditors of the Estate, and there is a chance that if the government fully collects on the penalties assessed against the Estate, then other creditors—including Kevin and Sean—may not recover their full claims. *See* Exhibits I and J.

In addition, under Mr. Garrity's estate plan, i.e., his will and the Revocable Trust, Kevin and Sean's children stand to inherit from the Estate, thereby providing an indirect benefit to Kevin and Sean. *See* Exhibits K and L. Moreover, Kevin and Sean directly benefit from the Estate if they survive Mr. Garrity's widow, Diane Garrity, because then they will receive a lifetime trust in the Revocable Trust's remaining principal, which will be passed onto their heirs. *Id*. Thus, if they are successful in prohibiting the government from collecting on the FBAR penalty, the Estate will have more assets for distribution to the Revocable Trust.

### 4. Kevin and Sean are key figures in this litigation.

Likewise, the fourth factor regarding the "role of the non-party witness in the litigation" also strongly favors the government. Under this factor, the trial court considers "[w]hether the

non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects ….” *LiButti*, 107 F.3d at 123–24.  Kevin and Sean were two of the three persons (including Paul, Jr.) who knew that Mr. Garrity had an interest in a foreign account in Liechtenstein.  Along with their brother Paul, Jr., Kevin and Sean were the secondary beneficiaries of the foreign trust that held the foreign account.  *See* Exhibit A.  Indeed, there is evidence that Kevin, at least, was involved with the foreign trust/foreign account as early as the 1990s.  *See* Exhibit E.  But all three sons were given a Power of Attorney with respect to the foreign trust/foreign account in June 2004.  *See* Exhibit D.

More importantly, Kevin and Sean (and Paul, Jr.) travelled with Mr. Garrity to Liechtenstein in June 2004 and were present when Mr. Garrity received $100,000 from the foreign account and then provided each of his sons $25,000 in cash.  *See* Exhibits B and C.  Thus, Kevin and Sean (and Paul, Jr.) were in a sense "co-conspirators" with Mr. Garrity with respect to the foreign account and as such they are "key figures" in this litigation.

In fact, Kevin and Sean justified their invocation of the Fifth Amendment to the Court on the basis, in part, that the statute of limitations for criminal conspiracy remained open.  *See* ECF No. 71, pp. 7-12.  The clear implication is that Kevin and Sean conspired with Mr. Garrity in concealing the foreign account.  Thus, it would be inequitable to permit Kevin and Sean to use the Fifth Amendment as a shield to stop the government from adducing eyewitness testimony that Mr. Garrity willfully failed to report his interest in the foreign account and then not allow the government an adverse inference from their refusal to testify.

**Conclusion**

For the foregoing reasons, the Court should grant the government's motion and allow an adverse inference.

Dated: April 3, 2018

                                                  RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

*/s/ Philip L. Bednar*
PHILIP L. BEDNAR
CARL L. MOORE
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
(202) 307-6415 (plb)/(202) 307-5892 (clm)
Philip.L.Bednar@usdoj.gov
Carl.L.Moore@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on April 3, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will provide notice of the filing with all registered participants.

>*/s/ Philip L. Bednar*
>PHILIP L. BEDNAR
>Trial Attorney, Tax Division
>U.S. Department of Justice