IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 3:15-cv-243 |
| Plaintiff, | ) | |
| | ) | Judge Michael P. Shea |
| v. | ) | |
| | ) | |
| DIANE M. GARRITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO ALTER AND REDUCE JUDGMENT**

Respectfully submitted,

UNITED STATES OF AMERICA

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

*/s/ Steven S. Tennyson*
STEVEN S. TENNYSON
PHILIP L. BEDNAR
CARL L. MOORE
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
(202) 307-0872
(202) 514-5238 (fax)
steven.s.tennyson@usdoj.gov

# Table of Contents

Preliminary Statement ........................................................................................................... 1

Statutory Background ............................................................................................................ 3

Argument ................................................................................................................................ 6

    I. ......................................................................................................................................... 6

        A.   The Penalty Assessed Was Entirely Consistent with the Text and Purpose of 31 U.S.C. § 5321(a)(5)(C). ................................................................................................. 6

        B.   Defendants' Reliance on § 103.47(g) to Deprive Congress's Subsequent Statutory Amendments of Legal Effect Reflects a Misunderstanding of Administrative Law. ...... 7

        C.   The Secretary Never Adopted a Lower Penalty Maximum. ............................................ 8

            1.   The initial willful penalty regulation, 31 C.F.R. § 103.47, did not adopt a penalty amount lower than the statutory maximum. ................................................................. 9

            2.   In 2004, the Secretary did not impose a lower penalty maximum through inaction. . 11

            3.   The Secretary did not impose a discretionary cap through ministerial tasks, like renumbering the regulation, indexing for inflation, or publishing a form. ................. 13

        D.   Even if the Secretary Had Imposed a Discretionary Cap, He Could Not Render Congress's Mandatory Increase Superfluous through Inaction. .................................... 18

        E.   *Colliot* and *Wadhan* Incorrectly Assumed that the Secretary Exercised Discretion to Limit the Maximum Penalty Authorized by the Statute. ............................................... 19

    II. ........................................................................................................................................ 21

        A.   The FBAR Penalty is Not Unconstitutional under the Eighth Amendment. ................. 21

        B.   The Civil FBAR Penalty Is Not a "Fine" for Purposes of the Eighth Amendment. ...... 21

        C.   FBAR Penalty Assessed Against Mr. Garrity is Not Unconstitutionally Excessive. .... 26

            1.   Mr. Garrity's crime was serious and there was evidence that he engaged in other criminal activity. .................................................................................................... 27

            2.   Mr. Garrity is within the class of persons for whom the FBAR requirement was designed. ................................................................................................................ 31

            3.   The FBAR penalty assessed against Mr. Garrity is within the statutory maximum established by Congress. ........................................................................................ 32

            4.   Mr. Garrity caused significant harm to the government by failing to timely report his foreign account. ................................................................................................... 35

        D.   The FBAR Penalty in Conjunction with the Foreign Trust Penalties is Not Unconstitutionally Excessive. ..................................................................................... 38

Conclusion .......................................................................................................................... 40

**Preliminary Statement**

This is a suit to reduce to judgment an FBAR penalty assessed against Paul G. Garrity, Sr.  Following a six day trial, a jury found that Mr. Garrity had willfully failed to disclose his interest in a foreign account, and that the government had properly calculated a penalty equal to 50-percent of the account in question.  *See* ECF No. 179.  On June 13, 2018, the Clerk of the Court entered a judgment in favor of the United States.  ECF No. 181.

Defendants filed this motion to reduce the amount of the judgment.  They argue that the FBAR penalty assessed against Mr. Garrity was unlawful for two reasons.  First, they argue that, despite being within the statutory maximum, the FBAR penalty exceeds the amount allowed by regulation.  Second, Defendants contend that the FBAR penalty is unconstitutionally excessive under the Excessive Fines Clause of the Eighth Amendment.  As described in more detail in the argument section below, the Court should deny Defendants' motion.

Until 2004, the maximum FBAR penalty was $100,000.  *See* 31 U.S.C. § 5321(a)(5) (1996-2004).  In 2004, Congress amended § 5321 providing that "the maximum penalty" in the case of a willful violation "shall be increased to the greater of—(I) $100,000, or (II) 50 percent of the amount" of the foreign account balance.  31 U.S.C. § 5321(a)(5)(C).  Consistent with the text, legislative history, and purpose of § 5321(a)(5)(C), the government assessed a willful FBAR penalty against Mr. Garrity equal to "50 percent" of the "balance in the account at the time of the violation."  *See* 31 U.S.C. § 5321(a)(C)(i)(II) & (D)(ii); *also* ECF No. 179.  This assessment carried out Congress's clear mandate and was therefore entirely proper.

1

Nevertheless, relying on a misguided view of administrative law, Defendants attempt to use an obsolete regulation—31 C.F.R. § 103.47(g)(2)—to reduce this assessment.[1]  Defendants' attempt to transform an obsolete regulation into a weapon against the government is based on two fundamental misunderstandings of administrative law.

First, Defendants overlook that the Secretary of the Treasury ("Secretary") never exercised his discretion to adopt a lower penalty maximum than the one provided by statute.  In promulgating the now obsolete regulation, the Secretary did not exercise discretion.  He simply parroted the existing maximum penalty set forth in the underlying statute.  Even Defendants acknowledge that the regulation "precisely follow[ed] the statutory language."  ECF No. 191-1 at 2.  As he simply parroted the statute, the Secretary did not exercise his expertise and experience to set a lower maximum penalty than permitted by Congress.  Indeed, a discretionary maximum penalty cap has never been proposed in a rule put up for notice and comment, much less considered and promulgated by the Secretary.  Even if the now obsolete regulation had gone through notice and comment, when Congress changed the statute, the rationale for the now obsolete regulation—parroting the maximum penalty set forth in the statute—was no longer tenable.  If the Secretary wanted to adopt a lower maximum penalty than permitted in the statute, the APA required him to provide a basis for doing so through a notice-and-comment rulemaking.  However, the Secretary has never initiated a notice-and-comment rulemaking to provide a rationale for a lower penalty maximum.  Defendants do not argue that the Secretary did, and do not even attempt to provide a rationale for a lower penalty maximum.  Instead, they contend that through inaction and various ministerial actions, the Secretary adopted this new policy *sub*

---

[1]  The regulation at issue was originally numbered 31 C.F.R. § 103.47(g)(2) between 1987 and 1999, then re-numbered to 31 C.F.R. § 103.57(g)(2), which lasted from 1999 to 2010.  The same regulation was re-numbered again in 2010 to 31 C.F.R. § 1010.820(g)(2).

*silentio*.  Such post-hoc explanations have no place in the judicial review of agency conduct. Even if they did, inaction or ministerial action are not appropriate mechanisms to impose a new penalty maximum under the APA.  As there is no binding, lower penalty maximum than the maximum permitted by the statute, the penalty assessment was appropriate.

Second, even had the Secretary imposed a lower penalty maximum, he could not maintain that position so as to nullify Congress's penalty increase.  Knowing that the maximum penalty was $100,000 under the statute, Congress increased the maximum penalty for willful violations "to the greater of—(I) $100,000, or (II) 50 percent of the amount" of the foreign account balance.  31 U.S.C. § 5321(a)(5)(C).  Faced with that clear mandate, the Secretary could not overrule Congress's sound policy judgment, by rendering this new statutory text superfluous through a regulation, without going through notice and comment.  Rather, the Secretary "must give effect to the unambiguously expressed intent of Congress" as he did here.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 847 (1984).

Moreover, the FBAR penalty assessed against Mr. Garrity was not unconstitutionally excessive under the Excessive Fines Clause.  As a threshold issue, it is not certain that a civil FBAR penalty is even considered a "fine" under the Eighth Amendment.  However, assuming that the FBAR penalty is considered a fine, applying the *Bajakajian* factors, it was not "grossly disproportional."  *See generally United States v. Bajakajian*, 524 U.S. 321 (1998).

### Statutory Background

In 1986, Congress established the willful FBAR penalty codified at 31 U.S.C. § 5321(a)(5).  From 1986 through 2004, § 5321(a)(5) provided a maximum penalty for a willful failure to file an FBAR of $25,000 or "an amount (not to exceed $100,000) equal to the balance in the account at the time of the violation," whichever was greater.  Tracking the maximum

penalty rules in the statute, the regulations during that period also provided for a willful FBAR penalty "not to exceed the greater of the amount (not to exceed $100,000) equal to the balance in the account at the time of the violation, or $25,000." 31 C.F.R. § 103.47(g)(2) (1987-1999); 31 C.F.R. § 103.57(g)(2) (1999-2004).

The preamble to the regulations stated the Secretary's intent to "[c]orrect the civil penalty amount that can be assessed for willful violations of the recordkeeping requirements of this Part." 52 FR 11436, 11440 (Apr. 8, 1987) ("Discussion of Comments," No. (20)). The preamble provided further that, "[i]n order to keep the regulations as current as possible, the amendments to the civil penalty amounts now reflect . . . [the] civil penalties for violations after October 1986 under the Anti-Drug Abuse Act of 1986." *Id.* Treasury also declined to "announce a 'safe harbor' of allowable civil violations of the regulations prior to assessing penalties," explaining that "Treasury has been given the authority and responsibility to enforce the Bank Secrecy Act, and intends to do so to the fullest extent possible." *Id.*

Notably, in enacting the regulation, the Secretary did *not* express any intent to limit its discretion to assess penalties for willful FBAR violations. The regulation's sole purpose was to "reflect" the "civil penalties for violations" of the statute "after October 1986" and, accordingly, it tracked but did not alter the rules for calculating the maximum penalty in the recently amended statute. *Id.* Treasury did not, in any way, implement a regulatory requirement that— independently of the statute—would limit the Secretary's discretion to assert the maximum penalty authorized by the statute. Indeed, in declining to establish the safe harbor that some commenters requested, the Secretary made clear his intent "to enforce the Bank Secrecy Act . . . to the fullest extent possible," 52 FR at 11440, which belies the suggestion that Treasury was trying to limit the broad discretion that Congress had granted it under the statute.

In 2004, Congress substantially increased the penalties for individuals failing to file FBARs.  For willful violations after October 22, 2004, Congress increased the maximum penalty to the greater of $100,000 or fifty percent of the account balance.  *See* 31 U.S.C. § 5321(a)(5)(C).  The amendment both: (1) discarded the $100,000 upper limit in the earlier statute, and (2) used half of the account balance (rather than the entire balance) as a factor in determining the maximum penalty.  *Id.*

Congress increased the penalty ceilings for willful FBAR violations in the 2004 Jobs Act to encourage individuals to report foreign financial accounts.  Congress had expressed concern that "there may be hundreds of thousands of taxpayers with offshore bank accounts attempting to conceal income from the IRS" and it believed "that improving compliance with this reporting requirement is vitally important to sound tax administration, to combating terrorism, and to preventing the use of abusive tax schemes and scams."  S. Rep. No. 108-192 at 108 (2003).  Thus, Congress both added "an additional civil penalty for a non-willful act [of] up to $10,000" and "increase[ed] the pr[ior] law penalty for willful behavior to the greater of $100,000 or 50 percent of the amount of the transaction or account."  H.R. Rep. No. 108-755 at 615 (2004).

The intent of Congress was clear.  In choosing the Senate Amendment (which "increase[d] the pr[ior]-law penalty for willful behavior") over the original House Bill (which did not), the Conference Committee made a specific decision to discard the maximum penalties in the prior statute and outdated regulation.  *Id.*  "The Congress believed that increasing the prior-law penalty for willful non-compliance with [the FBAR] requirement" would "improve the reporting of foreign financial accounts."  Joint Committee on Taxation, *General Explanation of Tax Legislation Enacted in the 108th Congres*s, JCS-5-05 at 387 (2005).  That objective was "vitally important to sound tax administration," because "the number of individuals using

offshore bank accounts to engage in abusive tax scams ha[d] grown significantly in recent years." *Id.*

## Argument

## I.

**A.  The Penalty Assessed Was Entirely Consistent with the Text and Purpose of 31 U.S.C. § 5321(a)(5)(C).**

As noted above, in 2004, Congress increased the maximum willful FBAR penalty. *Compare* 31 U.S.C. § 5321(a)(5)(C) *with* 31 U.S.C. § 5321(a)(5)(B) (West 2003). While the old previous penalty had ranged up to $100,000, *see id.*, the new penalty maximum imposed no monetary ceiling, just a percentage cap. *See* 31 U.S.C. § 5321(a)(5)(C). Congress's desire to increase the penalty maximum is clear from the text of the statute:

> (i) the maximum penalty [for willful violations] shall be increased to the greater of--
>
> > (I) $100,000, or
> >
> > (II) 50 percent of the . . . [foreign account balance].

31 U.S.C. § 5321(a)(5)(C).

This increase directly responded to the Secretary's concerns that the then-existing FBAR reporting regime was broken. *See, e.g.*, U.S. Dep't of the Treasury, A Report to Congress, 6, 9 (April 26, 2002) (the "Report") *available at* https://www.treasury.gov/press-center/press-releases/Documents/fbar.pdf. For instance, the Secretary had estimated to Congress that the FBAR compliance rate was barely over 20-percent. *Id.* at 6. (estimating that 800,000 individuals each year were in noncompliance); *see also Amy Hamilton*, A GLIMPSE INSIDE OFFSHORE GREED: TESTIMONY AT FINANCE HEARING ON FRAUDULENT TAX SCHEMES, 98 Tax Notes 297, (Lexis Jan. 20, 2003) (tax practitioner testifying before Senate that "a sector of the tax bar has become so

aggressive in its use of offshore products that the entire tax system is in jeopardy").  In response to this widespread noncompliance, Congress sought to "increase the present-law penalty for willful behavior to the greater of $100,000 or 50 percent of the amount of the transaction or account."  *See* H.R. Conf. Rep. 108-755; *reprinted at* 2004 U.S.C.C.A.N. 1341, 1663-68.

Here, the government implemented that amendment, assessing a willful penalty against Defendants, which was equal to "50 percent of the amount" of the foreign account balance.  *See* ECF No. 179; 31 U.S.C. § 5321(a)(5)(C).  Defendants acknowledge that § 5321 afforded the government authority "to impose higher penalties" than $100,000 if it "saw fit."  *See* ECF No. 190-1 at 8, 4 (stating that Congress "amended the FBAR penalty provision to increase the statutory maximum civil willful penalty under 31 U.S.C. § 5321(a)(5).").  Carrying out Congress's intent, the government exercised that authority here.  *See Norman v. United States*, — Ct. Cl. —, 2018 WL 3629293, at *8 (July 31, 2018) (explaining that "Congress clearly stated its intent to raise the maximum amount of FBAR penalties when it passed the [2004 statutory amendments]").  The Court should give legal effect to § 5321(a)(5)(C), and reject Defendants' attempt to use a regulation issued in 1987 to nullify the 2004 statutory amendment.

**B. Defendants' Reliance on § 103.47(g) to Deprive Congress's Subsequent Statutory Amendments of Legal Effect Reflects a Misunderstanding of Administrative Law.**

In enacting the APA, Congress settled "long-continued and hard-fought contentions, and enact[ed] a formula upon which opposing social and political forces have come to rest."  *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 523 (1978).  Under this formula, Congress is tasked with making fundamental policy decisions.  *See, e.g.*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (citing *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994)).  But it may delegate to agencies the authority to fill the interstices of a statute by legislative

regulation.  *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 371 (1989); *see also Chevron*, 467 U.S. at 842-43 (providing generally for substantive judicial review of regulations).

To issue legislative regulations, an agency must generally comply with Section 4 of the APA, 5 U.S.C. § 553, which "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'"  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).  First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily in the Federal Register.  *Id.* (citing § 553(b)).  Second, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  *Id.* (citing § 553(c)).  "An agency must consider and respond to significant comments received during the period for public comment."  *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose."  *Id.* (citing § 553(c)).  And where that "rationale is no longer tenable[,]" an agency must provide a new rationale for the regulation through notice and comment.  *See New York State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 132 (2d Cir. 2001) (citing *Tribune Co. v. F.C.C.*, 133 F.3d 61, 68 (D.C. Cir. 1998) (collecting cases)).  By mandating openness, explanation, and participatory democracy in the rulemaking process, these procedures assure the legitimacy of administrative norms.  *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979).  Accordingly, generally only regulations issued through notice-and-comment have the force and effect of law.  *Perez*, 135 S. Ct. at 1203 (citing *Chrysler Corp*, 441 U.S. at 302-303).

**C.  The Secretary Never Adopted a Lower Penalty Maximum.**

The core of Defendants' analysis is the assumption that the Secretary, through a regulation, adopted a lower penalty maximum than the one provided in the statute.  *See* ECF No.

190-1 at 6.  There are three possible options for when the Secretary could have exercised his discretion to adopt a lower penalty maximum than permitted by the statute: (1) when the regulation was first promulgated in 1987; (2) when the statute was amended in 2004 and the Secretary did not repeal or amend the regulation; and (3) when the regulation was re-numbered to 31 C.F.R. § 1010.820.  As shown below, the Secretary did *not* impose a lower penalty maximum at any of these times.

### 1. The initial willful penalty regulation, 31 C.F.R. § 103.47, did not adopt a penalty amount lower than the statutory maximum.

Following Congress's 1986 amendments to the Bank Secrecy Act, the Secretary began the notice-and-comment procedure for 31 C.F.R. § 103.47.  *See* 51 FR 30233-01, 30241, 1986 WL 105289.  The proposed rule, put up for notice and comment in the Federal Register, did not contain a reference to the willful FBAR penalty.  *Id.*  Without notice and comment, however, the Secretary tacked on 31 C.F.R. § 103.47(g) regarding the willful penalty.  *See* 52 FR 11436-01, 1987 WL 129587, *11446.

Far from setting an arbitrary limit below the statutory maximum, § 103.47(g) was set forth at the statutory maximum.  *Compare* 31 C.F.R. § 103.57(g)(2) *with* 31 U.S.C. § 5321(a) (West 1986).  And rather than demonstrating a reasoned decision to adopt a lower limit on the penalty, § 103.47(g)(2) merely parrots the existing statute, including its idiosyncratic use of a parenthetical.  *Compare* 31 C.F.R. § 103.47(g)(2) ("the amount (not to exceed $100,000)") *with* 31 U.S.C. § 5321(a)(5) ("the amount (not to exceed $100,000)").  Indeed, the administrative record makes clear that the Secretary simply updated the "civil penalty amounts" so that they "now reflect civil penalties applicable" under the 1986 amendments to the Bank Secretary Act.  52 FR 11436-01, 1986 WL 105289.

Defendants' construction of § 103.47(g)(2)—that it imposed a lower penalty maximum—suffers from two fundamental errors. *See*, *e.g.*, ECF No. 190-1 at 2 (referring to "§ 103.57(g)(2)"). First, § 103.47(g)(2) is a so-called "parroting regulation" and therefore not an exercise of discretion. *See* Hanah M. Volokh, THE ANTI-PARROTING CANON, 6 NYU J.L. & Liberty 290 (2011). Defendants recognize that § 103.47(g)(2) "precisely follow[ed] the statutory language," but ignore the implications of that congruency. Doc. 191-1 at 2; *see United States v. Gonzales*, 546 U.S. 243 (2006). An agency does not exercise its discretion, the Supreme Court has explained, "when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language[.]" *Id.* at 257; *see also Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) ("[W]here the underlying regulation does little more than restate the terms of the statute itself, the agency has left the statute as it found it, adding nothing material to Congress's language and providing nothing of its own in which to ground an interpretation to which a court might defer.") As in *Gonzales,* the Secretary merely parroted the statute without any analysis at all, much less apply his "expertise and experience to formulate" a new lower penalty maximum. *Gonzales*, 546 U.S. at 257. The regulation is a quintessential parroting regulation, not an exercise of discretion, as Defendants suggest. *See* ECF No. 191-1 at 2.

Second, Defendants misstate that § 103.47(g) went through notice and comment. ECF No. 190-1 at 2-3. The language in § 103.47(g) was neither present in the proposed rule subjected to the public notice-and-comment process nor the outgrowth of any feedback received during that process. *See* 51 FR 30233-01, 30241, 1986 WL 105289. Despite that, Defendants argue without citation that the Secretary "proposed in [his] regulation to exercise the maximum statutory discretion[.]" ECF No. 190-1 at 2. The Federal Register makes clear there was no such

proposal, *see* 51 FR 30233-01, 30241, 1986 WL 105289, and it appears Defendants confuse the proposed and final rules. *See* ECF No. 190-1 at 2-3. This confusion undercuts not only Defendants' unsupported interpretation of § 103.47(g), but also the doctrinal basis of their analysis. As there was no proposed rule (or any mention at all) related to willful penalties for individuals, § 103.47(g) fails at step one of "three-step procedure for 'notice-and-comment rulemaking.'" *See Perez*, 135 S. Ct. at 1203; *see Fertilizer Inst. v. E.P.A.*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (the "notice must 'provide sufficient detail and rationale for the rule to permit interested parties to comment meaningfully"); *Pub. Citizen, Inc. v. Mineta*, 427 F. Supp. 2d 7, 9 (D.D.C.), *aff'd sub nom. Pub. Citizen, Inc. v. Rubber Manufacturers Ass'n*, 533 F.3d 810 (D.C. Cir. 2008) (finding agency failed to provide "provide adequate notice and opportunity to comment" as "the final rule was not the logical outgrowth of the proposed rule."). Defendants are therefore misguided in arguing that the Secretary built an administrative record showing an exercise of discretion, *see* ECF No. 190-1 at 2, and that § 103.47(g)(2) is "binding[.]" ECF No. 190-1 at 3; *contra Perez*, 135 S. Ct. at 1203.[2]

**2. In 2004, the Secretary did not impose a lower penalty maximum through inaction.**

In 2004, faced with widespread noncompliance, Congress ordered that the "the maximum penalty . . . shall be increased to the greater of—(I) $100,000, or (II) 50 percent of the amount" of the foreign account balance. 31 U.S.C. § 5321(a)(5)(C). Congress's amendment necessarily renders the old penalty maximum in § 5321(a) obsolete. As is required by *Gonzales*, an *in pari materia* interpretation of § 103.47(g)(2) and § 5321 means the regulation is as obsolete as the

---

[2] To be clear, the government is *not* suggesting the Secretary did something wrong in enacting § 103.47(g) without notice-and-comment rulemaking. This was just a regulation that parroted the statue—Congress had already set the penalties for willful violations—so there was no need for notice and comment.

prior version of the statute.  *See Gonzales*, 546 U.S. at 257.

It makes no sense to allow a parroting regulation to survive the obsolescence of the underlying statute.  This is because § 103.47(g)(2)'s initial rationale—"reflect[ing] civil penalties applicable" in § 5321(a)—is no longer tenable.  52 FR 11436-01, 1986 WL 105289.  Obviously, after the 2004 amendments, different civil penalties were applicable and therefore the rationale of simply tracking the then-existing statutory penalties no longer applied.  Because "after-the-fact rationalization for agency action is disfavored," *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 81-82 (2d Cir. 2006), where the rationale in support of a regulation is "no longer tenable[,]" the agency must go through notice and comment to provide a new rationale.  *See Saranac Power Partners, L.P.*, 267 F.3d at 132; *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position").

The Secretary, however, has never gone through notice and comment to set a lower penalty maximum than permitted by the statute.  *See* 51 FR 30233-01, 1986 WL 105289 (F.R.); 52 FR 11436, 70 FR 66754; 71 FR 13260; 75 FR 19241; 75 FR 65806.  Critically, during that process, the Secretary would have had to provide "a concise general statement of [the lower penalty maximum's] basis and purpose." *Perez*, 135 S. Ct. at 1203 (citing § 553(c)); *see United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977) ("We do expect that, if the judicial review . . . is to be meaningful, the 'concise general statement of . . . basis and purpose' mandated by Section 4 will enable us to see what major issues of policy were ventilated.").  This means that the Secretary would have had to explain his decision to override Congress's sound policy judgment and impose a lower penalty maximum.  *See id*.  The Secretary would have had to justify retaining the penalty maximum that Congress had deemed inadequate,

and which led to the widespread noncompliance discussed in the Secretary's own reports to Congress. *See* the Report at 6. Notably, this contemporaneous statement of basis and purpose for a lower penalty maximum is entirely absent from Defendants' argument.

Instead, Defendants speculate that if the Secretary had thought it "necessary and important," he would have acted to repeal § 103.47(g)(2). ECF No. 190-1 at 8. Such post-hoc speculation has no place in the judicial review of agency conduct. *See, e.g., Islander E. Pipeline Co., LLC v. Connecticut Dep't of Env. Prot.*, 482 F.3d 79, 95 (2d Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) ("courts may not accept appellate counsel's post hoc rationalizations for agency action"). Putting that aside, regardless of the Secretary's subjective beliefs, what matters here is whether he put those beliefs into valid regulations in accordance with the APA's three-step procedure for notice-and-comment rulemaking. As shown above, he did not.

### 3. The Secretary did not impose a discretionary cap through ministerial tasks, like renumbering the regulation, indexing for inflation, or publishing a form.

Defendants' reliance on the Secretary's ministerial tasks, like renumbering § 103.47(g)(2), indexing $100,000 to inflation, and publishing a form, is similarly misplaced. Defendants never establish, at any of these times, that the Secretary exercised his discretion by providing a "concise general statement of . . . basis and purpose mandated by Section 4 [of the APA]" that would enable this Court "to see what major issues of policy were ventilated[.]" *Nova Scotia Food Prod. Corp.*, 568 F.2d at 252. Instead, Defendants simply use these events to support their after the fact explanation for the Secretary's conduct. That speculation, however, cannot support an exercise of agency discretion. *See Islander E. Pipeline Co., LLC v. Connecticut Dep't of Env. Prot.*, 482 F.3d 79, 95 (2d Cir. 2006).

These ministerial tasks cannot be an exercise of the Secretary's discretion to limit the maximum penalty.  The Secretary cannot *sub silentio* "ratify" the obsolete regulation in order to take a new position without providing a new rationale through notice-and-comment.  *Fox Television Stations, Inc.*, 556 U.S. at 515 ("An agency may not, for example, depart from a prior policy *sub silentio*" without violating the APA).  But even as a factual matter, these ministerial tasks do not carry the weight that Defendants give them.

With respect to the renumbering task, in 2010, the Treasury reorganized its regulations regarding the Bank Secrecy Act and, in that process, it renumbered the obsolete regulation from 31 C.F.R. § 103.57 to 31 C.F.R. § 1010.820.  *See* Final Rule, 75 FR 65806 (Oct. 26, 2010).  The republication of the regulation with a new number was not an exercise of the Secretary's rulemaking authority to limit the willful FBAR penalty to an amount less than the maximum established by Congress.  Rather, the Treasury was merely "renumbering . . . the BSA regulations in a manner that ma[de] it easier to find regulatory requirements than under the numbering system [previously] used in the [prior] regulations."  *Id.* at 65806.  Because the renumbering was ministerial, rather than substantive, the Treasury rejected "all comments . . . that requested a substantive change, or would result in a substantive change," as "outside the scope of th[e] rulemaking." *Id.* at 65807.  Thus, Treasury declined to repeal portions of the regulations that "appear[ed] . . . obsolete," including "certain portions of the previous 31 C.F.R. § 103.57."  *Id.*  For that reason, the republication of the regulation did not change its validity or effectiveness.

Notably, six months before the Treasury renumbered 31 C.F.R. § 103.57 to 31 C.F.R. § 1010.820, it had proposed changes to certain Bank Secrecy Act regulations that "would require changes to the instructions to the FBAR."  Notice of Proposed Rulemaking, 75 FR 8844, 8849

14

(Feb. 26, 2010).  The proposed draft instructions stated:

> A person who willfully fails to report an account or account identifying information may be subject to a civil monetary penalty equal to the greater of $100,000 or 50 percent of the balance in the account at the time of the violation. See 31 U.S.C. § 5321(a)(5).

*Id.* at 8854.  The proposed draft instructions make clear the Treasury's view—*before* it

reorganized the regulations—that § 5321(a)(5) of the statute (and *not* 31 C.F.R. § 103.57)

governed the maximum penalty for a willful FBAR violation.  Even earlier, in July of 2008, the

IRS had also acknowledged in the Internal Revenue Manual that "the regulations at 31 C.F.R. §

103.57 ha[d] not been revised to reflect the change in the willfulness penalty ceiling," but it

nevertheless stated that "the statute is self-executing and the new penalty ceilings apply." I.R.M.

§ 4.26.16.4.5.1 (07-01-2008), *available at* 2008 WL 5900930.  Thus, both Treasury and the IRS

consistently applied the penalty ceilings under the statute to willful FBAR violations, even

though those ceilings were higher than those in the obsolete regulation.  And, as the Treasury

explained when it reorganized the Bank Secrecy Act regulations, it was not making any

substantive changes when renumbering the regulations.  The outdated regulation became

obsolete when Congress amended the statute in 2004, and the Secretary did nothing thereafter to

re-adopt it.

Turning to the indexing $100,000 to inflation task, Defendants point to 31 C.F.R.

§ 1010.821(b) for the proposition that the Secretary recognized that the "maximum penalty

amount" for a violation of 31 U.S.C. § 5321(a)(5)(C) "to be $100,000 adjusted for inflation."

ECF No. 190-1 at 9.  However, the inflation regulation only provides inflation calculations for

penalties that are subject to adjustment under the Federal Civil Penalties Inflation Adjustment

Act ("FCPIA") (as further amended by the Federal Civil Penalties Inflation Adjustment Act

Improvement Acts of 2015 "the "2015 Act"), which is codified as a note under 28 U.S.C. 2461;

the interim final rule promulgating § 1010.821(b) clarifies that the FCPIA does not apply to

certain Bank Secrecy Act penalties that "lack a stated dollars amount and are instead written

solely as functions of violations."  81 FR 42503-01.  Under the FCPIA, "'civil monetary penalty'

means any penalty, fine, or other sanction that—(A)(i) is for a specific monetary amount as

provided by Federal law; or (ii) has a maximum amount provided for by Federal law…."  28

U.S.C. § 2461, note.  In a memorandum from the OMB dated February 24, 2016, entitled

"Implementation of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of

2015," the OMB advised agencies that:

> the adjustment [required by the FCPIA] will apply only to penalties with a dollar
> amount, and will not apply to penalties written as functions of violations. …  In
> the case of a penalty with only some dollar amounts, e.g., 'the penalty shall be the
> maximum of either twice the value of the transaction or $250,000,' only the dollar
> figure, in this case $250,000, will be subject to adjustment.

See OMB, Memorandum for the Heads of Executive Departments and Agencies (Feb. 24, 2016),

available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2016/m-

16-06.pdf.  Accordingly, the FCPIA does not require what should be an obvious proposition, the

Secretary cannot identify an inflation amount for the maximum penalty based on "50-percent of

the account balance" because it is a moving target—a "function of the violation."  Therefore, the

Secretary was not setting a lower penalty maximum in implementing § 1010.821(b).

The last ministerial task highlighted by Defendants is that the Secretary failed to timely

update the FBAR form.  Defendants imply that the Secretary could not have intended for the

penalty to be higher than $100,000 because in the Privacy Act and Paperwork Reduction Act

Notice on the bottom of the FBAR form, it stated "Civil and criminal penalties, including in

certain circumstances a fine of not more than $500,000 and imprisonment of not more than five

years, are provided for failure to file a report…."  ECF No. 190-1 at 10-11.  They argue that

failure to update the form "could not have been an accident," *see* ECF No. 190-1 at 11, because "[t]he Privacy Act of 1974 … requires an agency to supply information to the public on the form … that includes the effects on the individual of not providing … the requested information." ECF No. 190-1 at 11.  However, nothing in the Privacy Act requires the level of specificity suggested by Defendants—the agency does not need to identify every possible civil or criminal penalty.  *See United States v. Rickman*, 638 F.2d 182, 183 (10th Cir. 1980) ("Nothing in the Privacy Act, and no decision of which we are aware, requires a notice of the specific criminal penalty which might be imposed.  Such specific notice is not required.  Otherwise, a mass of penal law would have to be mentioned in the notice."); *accord United States v. Annunziato*, 643 F.2d 676, 678 (9th Cir. 1981); *United States v. Bell*, 734 F.2d 1315, 1318 (8th Cir. 1984).  The Secretary was not obligated to update the FBAR form when Congress increased the maximum willfulness penalty so it is nonsensical to suggest that the form somehow shows that the Secretary intended to set a lower penalty maximum.

Even on its own terms, Defendants' post-hoc explanation fails.  It only attempts to explain what the Secretary did, not why he did it.  Indeed, why the Secretary would impose a lower penalty maximum is entirely absent from Defendants' theory.  Thus, even accepting all of the post-hoc explanation, Defendants' failure to identify any reason—much less one that would clear the prohibition against arbitrary and capricious rulemaking—is fatal to their theory.  *Nova Scotia Food Prod. Corp.*, 568 F.2d at 252 (explaining that the exercise of agency power without offering a reason is arbitrary and capricious); *Fox Television Stations, Inc.*, 556 U.S. at 515.  As the Secretary never imposed a lower penalty maximum than the statutory maximum, the assessment—equal to the statutory maximum—was appropriate.

**D. Even if the Secretary Had Imposed a Discretionary Cap, He Could Not Render Congress's Mandatory Increase Superfluous through Inaction.**

To be clear, the Secretary did not impose a discretionary cap on the penalty maximum. But even if it did, he could not maintain the old penalty maximum after Congress's 2004 amendments to § 5321. As the Supreme Court stated: "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). In other words, Congress's policy judgments prevail, and agencies "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Thus, if Congress has "directly spoken to the precise question at issue[,] . . . that is the end of the matter." *Id*.

Here, Congress's intent could not be clearer. Before amending the statute in 2004, the maximum penalty was $100,000. In 2004, Congress amended the statute increasing that amount. *See* 31 U.S.C. § 5321(a). "This text is unambiguous" and evinces a clear "mandate that the maximum penalty allowable for willful failure to report a foreign bank account be set at a specific point: the greater of $100,000, or 50 percent of the account's balance." *See Norman*, 2018 WL 3629293, at *8. Thus, the text of the statute alone shows Congress's clear intent. In addition, the legislative history reinforces the text: Congress sought to "increase the present-law penalty for willful behavior to the greater of $100,000 or 50 percent of the amount of the transaction or account." *See* H.R. Conf. Rep. 108-755; reprinted at 2004 U.S.C.C.A.N. 1341, 1663-68. Finally, Defendants recognize that this is the purpose of the amendment: Congress "amended the FBAR penalty provision to increase the statutory maximum civil willful penalty under 31 U.S.C. § 5321(a)(5)." *See* ECF No. 190-1 at 4.

Faced with that overwhelmingly clear mandate, the Secretary is tasked with implementing that directive, as he did here. *See Chevron, Inc*., 467 U.S. at 842-43. Reconciling statutes in this way is not tantamount to an implied repeal, as Defendants suggest. Rather, this is

a fundamental aspect of statutory interpretation: looking at "many laws enacted over time, . . .

getting them to 'make sense' in combination," *see United States v. Fausto*, 484 U.S. 439, 453

(1988), and construing them so that "'no part will be inoperative or superfluous, void or

insignificant.'"  *Hibbs v. Winn*, 542 U.S. 88, 102 (2004) (quoting 2A Norman J. Singer, Statutes

and Statutory Construction § 46.06, at 181, 186 (6th rev. ed. 2000)).  Consistent with these well-

established principles, the Secretary was required to give legal effect to Congress's clear intent.

*Chevron*, 467 U.S. at 842-43.  He is not free, as Defendants argue, to simply edit the parameters

of his discretion, without notice and comment, so as to nullify Congress's policy judgment and

the 2004 statutory amendment.  *See Chevron, Inc.*, 467 U.S. at 842-43; *Norman*, 2018 WL

3629293, at *9 (rejecting *Colliot*'s analysis as unpersuasive on similar grounds).

**E.  *Colliot* and *Wadhan* Incorrectly Assumed that the Secretary Exercised Discretion to Limit the Maximum Penalty Authorized by the Statute.**

In support of their argument that the earlier regulation (which was made obsolete by a

later statute) overrides Congress's clear intent to increase the maximum penalty, Defendants ask

the Court to accept the analysis applied in the recent decisions in *United States v. Colliot*, 2018

WL 2271381 (W.D. Tex. May 16, 2018) and *United States v. Wadhan*, 2018 WL 3454973 (D.

Colo. July 18, 2018).  *See* ECF No. 190-1 at 12; ECF No. 195-1.  In both *Colliot* and *Wadhan*,

the courts focused their analysis on the fact that they could "harmonize" the text of the statute

and the regulation, *see Colliot*, 2018 WL 2271381, at *2 and *Wadhan*, 2018 WL 3454973, at *3,

because the statute gave the Secretary discretion.  *But see Norman*, 2018 WL 3629293, at *8

(finding that after the 2004 statutory amendments, "the regulation [was] no longer consistent

with the amended statute" because "Congress clearly raised the maximum civil money penalty in

§ 5321 to the greater of $100,000.00 or one half of the balance of the account.").  The *Colliot*

and *Wadhan* courts assumed that the Secretary had exercised his authority to reduce the

maximum penalty authorized under the statutory cap.  *See Colliot*, 2018 WL 2271381, at *2

("And § 1010.820 … purports to cabin that discretion by capping penalties at $100,000.");

*Wadhan*, 2018 WL 3454973, at *3 ("in the exercise of statutory discretion, the Secretary limited

the penalties that the IRS could impose to $100,000").  However, the analysis applied in these

cases overlooked the fact that the Secretary never exercised such discretion when the regulation

was originally put in place—quite the opposite, as discussed above, the regulation parroted the

statute with respect to the maximum authorized penalty thereby showing that the Secretary was

not exercising discretion.  *See* Section I.C.1. above.[3]

Moreover, in assuming that the Secretary exercised discretion to set a lower penalty

maximum, *Colliot* and *Wadhan* ignore the temporal-nature of rulemaking, i.e., rules must be

considered in context with the statutory scheme that existed at the time the rule was promulgated.

*See*, *e.g.*, *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) (holding that a

Treasury regulation's failure to include a specific expense did not mean that those expenses were

not permitted because at the time the regulation was passed the statutory scheme did not

contemplate such expenses); *Gonzales*, 546 U.S. at 257–58 (holding the *Auer* deference was

unwarranted for an interpretive regulation under the Controlled Substances Act, in part, because

"if there [was] statutory authority to issue the Interpretive Rule it [came] from the 1984

amendments to the CSA" and "[t]he regulation was enacted before those amendments, so the

---

[3]  Some of the other "factual" errors in the analyses applied in *Colliot* and *Wahdan* are also
discussed above.  For instance, in *Colliot*, the court was mistaken that the willful penalty
provision in § 1010.820(g)(2) was enacted via notice-and-comment rulemaking.  2018 WL
2271381, at *2 ("And § 1010.820—a regulation validly issued by the Treasury via notice-and-
comment rulemaking …").  And in *Wahdan*, the court emphasized that the Secretary regularly
updated the inflation regulation (31 C.F.R. § 1010.821) identifying $100,000 as the maximum
penalty, *see* 2018 WL 3454973, at *3; however, this overlooks the fact that the Secretary was not
required to include the 50-percent penalty in the inflation table because the FCPIA does not
apply to penalties that are a "function of the violation," i.e., percentage-based penalties.

Interpretive Rule cannot be justified as indicative of some intent the Attorney General had in 1971"). In short, *Colliot* and *Wadhan* did not analyze the facts and principles of administrative law addressed above; accordingly, the Court should not find their analysis persuasive.

II.

**A.  The FBAR Penalty is Not Unconstitutional under the Eighth Amendment.**

Defendants argue that the FBAR penalty assessed against Mr. Garrity is unconstitutional under the Eighth Amendment because it violates the Excessive Fines Clause. *See* ECF No. 190-1 at 13-18. Defendants bear the burden to show that the FBAR penalty is unconstitutionally excessive. *See United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010); *United States v. Bussell*, 699 F. App'x 695, 696 (9th Cir. 2017).

The Eight Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. To establish that a civil penalty is unconstitutional under the Excessive Fines Clause, a defendant must show: (1) that the exaction at issue is a "fine" within the scope of the Eighth Amendment; and (2) that the fine is "excessive." *See United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016); *Dewees v. United States*, 272 F. Supp. 3d 96, 100 (D.D.C. 2017) ("In analyzing an excessive fines claim, the Court must first decide whether a penalty is a fine before determining if it is unconstitutionally excessive.").

**B.  The Civil FBAR Penalty Is Not a "Fine" for Purposes of the Eighth Amendment.**

It appears that no court has expressly decided that an FBAR penalty is a fine subject to the Eighth Amendment. Defendants identify cases where "[t]he Eighth Amendment inquiry has been applied in the FBAR context," *see* ECF No. 190-1, at 14, but those cases simply "assumed" an FBAR penalty to be a fine before considering whether it was excessive. *See*, *e.g.*, *United States v. Bussell*, 2015 WL 9957826 at *7-9 (C.D. Cal. Dec. 8, 2015) (analyzing claim that

willful FBAR penalty violated Excessive Fines Clause by addressing only excessiveness and not considering whether it was a fine); *Bussell*, 699 F. App'x at 696 (same)  *Moore v. United States*, 2015 WL 1510007, at \*12 (W.D. Wash. Apr. 1, 2015) ("The court assumes without deciding that civil FBAR penalties are 'fines' within the meaning of the Eighth Amendment[.]").

The Supreme Court has differentiated between certain exactions that are remedial, and thus are not "fines" within the Eighth Amendment's meaning, and others that are punitive and therefore are "fines" that violate the Constitution if they are "excessive." *See Austin v. United States*, 509 U.S. 602, 610 (1993) (explaining that a government-ordered payment is a "fine" for purposes of the Eighth Amendment if "it can only be explained as serving in part to punish."); *United States v. Halper*, 490 U.S. 435, 448 (1989) ("a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment…."); *Korangy v. FDA*, 498 F.3d 272, 277 (4th Cir. 2007) ("Civil fines serving remedial purposes do not fall within the reach of the Eighth Amendment."); *Dewees*, 272 F. Supp. 3d at 100 (for penalty to qualify as "fine" under Eighth Amendment, "the penalty must be primarily retributive or deterrent rather than remedial"). Thus, application of the Supreme Court guidance to the FBAR penalty requires a close analysis. *See United States v. Lippert*, 148 F.3d 974, 977-78 (8th Cir. 1998) (expressing uncertainty over "whether the Excessive Fines Clause applies to Anti-Kickback Act civil penalties" based on "conflicting" language in *Austin* and *Bajakajian*); also *U.S. Sec. & Exch. Comm'n v. Metter*, 706 F. App'x 699, 703 (2d Cir. 2017) ("For the purposes of this appeal, we *assume without deciding* that … the disgorgement liability imposed in this matter was essentially punitive in nature and thus was a fine within the meaning of the Excessive Fines Clause[.]") (emphasis added).

The case law on the Excessive Fines Clause arises almost entirely from forfeiture actions, not civil actions to collect monetary penalties like the FBAR penalty.  In *Bajakajian*, 524 U.S. at 328, the Supreme Court held that a criminal forfeiture was subject to the Excessive Fines Clause, but it is unclear to what extent that the reasoning from *Bajakajian* might be applicable outside its specific context.  "*Bajakajian* was the first—and to date is the only—Supreme Court case that actually applies the Excessive Fines Clause."  *In re Wyly*, 552 B.R. 338, 606 (Bankr. N.D. Tex. 2016); *see also Bajakajian*, 524 U.S. at 327.

The conclusion in *Bajakajian* that the forfeiture was an Eighth Amendment "fine" depended, in part, on the fact that the forfeiture was "imposed at the culmination of a criminal proceeding and require[d] conviction of an underlying felony."  524 U.S. at 328.  The Supreme Court has contrasted this fact pattern with other types of forfeiture where "no criminal offense, much less a criminal conviction, is required."  *One Lot Emerald Cut Stones v. United States*, 409 U.S. 233, 236 n.6 (1972) (per curiam).  Because the civil FBAR penalty can be imposed regardless of the existence of any underlying criminal offense, *Bajakajian* is arguably distinguishable on this basis, with *One Lot Cut Emerald Stones* plausibly being seen as more closely comparable to our case.  *See also Louis v. Comm'r*, 170 F.3d 1232, 1236 (9th Cir. 1999) (tax penalties for fraud are not fines under Eighth Amendment because "unlike the forfeiture at issue in *Bajakajian*, additions to tax for fraud can be imposed regardless of whether the taxpayer has been convicted of a felony") (citing *Helvering v. Mitchell*, 303 U.S. 391, 406 (1938)).

In *One Lot Emerald Cut Stones*, the Supreme Court held that a customs statute requiring forfeiture of undeclared goods and levying a monetary penalty equal to their value imposed "remedial rather than punitive sanctions" because it "provides a reasonable form of liquidated damages for violation" of tariff regulations.  409 U.S. at 237.  The FBAR penalty can likewise be

viewed as providing a reasonable form of liquidated damages for any potential tax loss (and associated expense of investigation) that the government frequently suffers when offshore accounts are not reported by taxpayers.  *See Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 n.7 (1989) (noting historical "dichotomy between fines and damages" as part of extended discussion of historical background of Excessive Fines Clause); *see also Bajakajian*, 524 U.S. at 342 (describing some customs forfeitures as nonpunitive because they served "the remedial purpose of reimbursing the Government for losses accruing from the evasion of customs duties").

Such damages need not track the actual loss to the public fisc with perfect accuracy because "the Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages."  *Halper*, 490 U.S. at 446.[4]  Although an FBAR penalty can be imposed in the absence of any identifiable tax loss, the likelihood that an FBAR violation is related to a tax loss may be enough for the FBAR penalty to fall outside the Eighth Amendment's scope.  *See Bajakajian*, 524 U.S. at 342 n.17 (that certain forfeitures were related to offenses "likely to cause the Government losses in customs revenue" was enough to make such forfeitures remedial and non-punitive); *see also Hudson v. United States*, 522 U.S. 93, 102 (1997) (remarking that "no civil penalties" are "'solely' remedial" or "entirely nondeterrent").

Another reason why the FBAR penalty is not limited by the Excessive Fines Clause is its similarity to civil tax penalties.  There is no question that civil tax penalties are remedial, and thus not Eighth Amendment "fines," and the FBAR penalty is readily analogized to civil tax

---

[4]  The double-jeopardy analysis of *Halper* has since been abrogated, but the broader point about "rough remedial justice" not qualifying as "punishment" is still good law.

penalties in terms of its functioning and purpose.  *See Helvering*, 303 U.S. at 401 (noting "[t]he remedial character of sanctions imposing additions to tax," which are "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud."); *Louis*, 170 F.3d at 1236 (tax fraud penalties assessed under 26 U.S.C. § 6653(b) "are 'properly . . . characterized as remedial'" under *Austin*, 509 U.S. at 608 n.4, "and as such, are not subject to review under the Excessive Fines Clause."); *Wyly*, 552 B.R. at 603 (cautioning "against expanding the Supreme Court's Excessive Fines Clause jurisprudence into the realm of civil tax penalties, where it has never before been successfully used to strike down a civil tax penalty as unconstitutional"); *but see United States v. Simonelli*, 614 F. Supp. 2d 241, 247 (D. Conn. 2008) ("Defendant's debt for the FBAR penalty is for a 'penalty' within the meaning of 11 U.S.C. § 523(a)(7), and therefore falls within that section's broad class of debts excepted from discharge").

An instructive recent case is *Dewees*, 272 F. Supp. 3d at 98, where a taxpayer challenged the IRS's assessment of $120,000 in civil tax penalties for his failure to meet an information-reporting requirement by not filing Form 5471—a close cousin of the FBAR—on which he was required to disclose his ownership of a foreign corporation.  That $120,000 consisted of 12 consecutive years of statutory $10,000 annual penalties, *see* 26 U.S.C. § 6038(b)(1).[5]  The court found the $120,000 in penalties to be remedial and not subject to the Eighth Amendment.  *Id*. at 100-01.  This was despite the fact that, "[t]he total penalty was based entirely on Dewees' failure to file; he was not liable for any unpaid taxes." *Id*. at 99.  As noted above, an FBAR penalty can

---

[5]  In *Dewees*, the taxpayer was also assessed an additional $185,862 in FBAR penalties, though he appears not to have argued that the FBAR penalties were excessive fines, or that their cumulative effect with the other penalties was excessive.  272 F. Supp. 3d at 99.

similarly be assessed in the absence of any tax loss. *See also Wyly*, 552 B.R. at 613 (holding that

penalties under 26 U.S.C. § 6677 for failing to report foreign trusts are not Eighth Amendment

"fines"). Thus, it is far from a settled issue that civil FBAR penalties are "fines" subject to

Eighth Amendment analysis. If the Court determines that the civil FBAR penalty at issue in this

case is not a fine, then there is no need for the Court to engage in the second step of the analysis.

## C. FBAR Penalty Assessed Against Mr. Garrity is Not Unconstitutionally Excessive.

If the Court determines that the FBAR penalty is a "fine" subject to the Eighth

Amendment, then it should find that the FBAR penalty assessed against Mr. Garrity was not

unconstitutionally excessive. A fine is "excessive" under the Eighth Amendment only if it is

"*grossly* disproportional" to the gravity of the offense. *Bajakajian*, 524 U.S. at 336-337

(emphasis added). In *Bajakajian*, the Supreme Court observed that "judgments about the

appropriate punishment for an offense belong in the first instance to the legislature," and that

"any judicial determination regarding the gravity of a particular criminal offense will be

inherently imprecise." *Id*. at 336. "Both of these principles counsel against requiring strict

proportionality between the amount of a punitive forfeiture and the gravity of a criminal

offense." *Id*.

The Second Circuit has recognized four factors to guide the "grossly disproportional"

analysis:

> [1] the essence of the crime of the defendant and its relation to other criminal
> activity, [2] whether the defendant fits into the class of persons for whom the
> statute was principally designed, [3] the maximum sentence and fine that could
> have been imposed, and [4] the nature of the harm caused by the defendant's
> conduct.

*Castello*, 611 F.3d at 120 (edits in original). It is worth noting that the references in the

*Bajakajian* factors to "crime," "criminal activity," and "maximum sentence" indicate the extent

to which Excessive Fines Clause cases almost always concern forfeiture in criminal offenses,

making the application of *Bajakajian* to statutory civil penalties tenuous.  Still, in applying these

four factors to this case, the Court should find that the FBAR penalty assessed against Mr.

Garrity was not unconstitutional.

> **1.  Mr. Garrity's crime was serious and there was evidence that he engaged in other criminal activity.**

Turning to the first *Bajakajian* factor, "the essence of the crime of the defendant and its

relation to other criminal activity," the jury found that Mr. Garrity willfully failed to report his

foreign financial account—thus his "crime" was a reporting offense.  In weighing the essence of

the crime involving a reporting offense, it is appropriate to take into account the larger regulatory

scheme that makes the defendant's conduct a "crime."  For example, in *Sanders v. Szubin*, 828 F.

Supp. 2d 542, 553 (E.D.N.Y. 2011), the court analyzed the first *Bajakajian* factor involving a

civil fine imposed on the defendant for willfully failing to respond to a request for information

regarding his suspected trip to Cuba.  *Id*. ("Constitutional analysis of punishment starts with the

sin.").  The court noted that the request for information was "part of a complex regulatory

scheme," which was necessary for the government to ensure compliance with the Cuban

embargo.  *Id*.  "Without such penalty power and without across the board resort to it to impose

penalties, compliance would quickly wither and, obviously, the cumulative effects of

nonenforcement and noncompliance would eviscerate [the government's] ability to administer

the embargo."  *Id*.  The court also recognized that the defendant's "willful" failure to report

"[r]ais[ed] the ante" because "outright defiance of the obligation … no matter how small"

threatened the regulatory scheme.  *Id*.  After considering the complex regulatory scheme and the

defendant's willful failure the court concluded, "[i]n weighing proportionality, the sin—

substantively and procedurally—[was] serious."  *Id*.

Likewise, here, Mr. Garrity's obligation to report his foreign account is part of a larger enforcement scheme. As discussed in detail above (and below), Congress enacted the FBAR requirement to protect the public fisc; Congress recognized that strong penalties for willful violations of the law were necessary to increase compliance. As Mr. Garrity willfully failed to abide by this requirement, the nature of his crime is serious "substantively and procedurally." On the essence of the crime alone, the Court should find that the first factor cuts for government.

Furthermore, regarding Mr. Garrity's failure to disclose his foreign account and relationship to other criminal activity, the government presented evidence that showed there was more than a whiff of impropriety with respect to Mr. Garrity's undisclosed foreign account. For instance, the evidence showed that Mr. Garrity went to Liechtenstein in 2004, withdrew $100,000 in cash from his foreign account, gave $25,000 to each of his three sons (while keeping $25,000 for himself), and then they all flew back to the United States with a significant portion of the cash. *See* Trial Transcript dated June 8, 2018, 56:2 – 60:11, attached as **Exhibit A**. Defendant Paul Garrity, Jr., testified that he knew that it was wrong to bring back more than $10,000 in cash into the United States, so he gave the "difference" to his brothers to carry into the United States, and then his brothers returned the money to him after they went through United States Customs. *See* Exhibit A, 58:1–60:11. Thus, Defendant Paul Garrity, Jr., admitted that he and his brothers conspired to violate 31 U.S.C. § 5316(a)(1)(B), which requires persons to report to the government when they transport more than $10,000 into the United States. The reasonable inference was that Mr. Garrity was also part of this conspiracy as he is the one that initially gave each of his sons the $25,000 in cash; the other reasonable inference is that Mr. Garrity (and his other two sons, Kevin and Sean Garrity) also brought back more than $10,000 into the United States, adding additional counts to violating 31 U.S.C. § 5316(a)(1)(B).

Moreover, Mr. Garrity's willful failure to file an FBAR was not a "one off" violation.  He established the foreign account in 1989 and never reported it to the government.  To hide this account for such a long-period of time, Mr. Garrity not only failed to file an FBAR year-after-year, but he also submitted false statements on his personal income tax returns for tax years 1989 through 2006 by failing to disclose the foreign account on his Schedule B.[6]  Thus, Mr. Garrity's criminal activity included not only crimes of omission but commission as well.

Defendants compare this case to *Bussell*, 2015 WL 9957826, *United States v. Williams*, 489 F. App'x 655 (4th Cir. 2012), and *United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012), for the proposition that the government must show a tax scheme to impose the maximum penalty.  *See* ECF No. 190-1 at 15-16.  However, in those cases, the defendants were alive so the government had a fair opportunity to investigate their tax schemes.  Here, Mr. Garrity never reported the foreign account while he was alive so the government did not have the opportunity to timely investigate the source of the funds that were deposited in his foreign account or discover his purpose for opening and hiding the foreign account.  The funds Mr. Garrity used to seed his foreign account could have been part of a tax scheme, but because Mr. Garrity did not timely disclose this account, the government could not effectively investigate.  As discussed in more detail in the section below dealing with the fourth *Bajakajian* factor (harm), the whole point of the FBAR requirement is timely disclosure so the government has an opportunity to investigate.  Defendants cannot use the fact that Mr. Garrity failed to timely disclose the foreign account to fault the government for failing to discover all of the facts surrounding his foreign account.

---

[6]  Mr. Garrity died in February 2008 before his 2007 personal income tax return was due.

In addition, Defendants never offered an innocent explanation for Mr. Garrity opening the foreign account or failing to disclose it; they never offered evidence of the source of the funds in the foreign account, and it is their burden to show that the FBAR penalty was unconstitutionally excessive. *See*, *e.g.*, *United States v. Sims*, 578 F. App'x 218, 223 (4th Cir. 2014) (where the defendant did not show that forfeiture of his car was excessive, in part, because the defendant "offered no evidence regarding the value of the [car]."); *United States v. Fogg*, 666 F.3d 13, 19 (1st Cir. 2011) (holding that the district court erred in "placing the burden on the government to prove that [the defendant] could pay" and by "overlooking the fact that defendant had … presented no evidence that the forfeiture order would deprive him of his livelihood.").

The absence of these facts distinguish this case from *Bajakajian*. There, Bajakajian tried to leave the country with $357,144 in cash and was arrested for failing to declare the funds to United States Customs. 524 U.S. at 325. The government demanded the entire $357,144 under a statute mandating forfeiture of any property "involved in" a broad range of criminal offenses. *Id*. The Supreme Court held that the criminal forfeiture of $357,144 was disproportionate to the defendant's particular offense, which was "solely a reporting offense" and was "unrelated to any other illegal activities." *Id*. at 337-38. Important to the Supreme Court's opinion were the facts found by the district court, specifically, that "the funds were not connected to any other crime," that Bajakajian "was transporting the money to repay a lawful debt," and that Bajakajian only "failed to report that he was taking the currency out of the United States because of fear stemming from 'cultural differences': [Bajakajian], who had grown up as a member of the Armenian minority in Syria, had a 'distrust for the Government.'" *Id*. at 326.

Unlike the defendant in *Bajakajian*, Defendants did not show that the money in Mr. Garrity's account was derived from "legal activity." *Bajakajian*, 524 U.S. at 338. They did not

offer any evidence regarding the source of the funds. And because it is Defendants' burden to

show that the FBAR penalty is unconstitutionally excessive, it was for Defendants to present

evidence to show that the funds Mr. Garrity stashed in his foreign account were derived from a

lawful source. Here, Mr. Garrity did not timely disclose his foreign account while he was alive,

so that the government could not effectively investigate. It would be inequitable to allow Mr.

Garrity to profit from his nondisclosure by defeating the legislatively authorized penalty for

nondisclosure. Thus, the Court should find that this first factor weighs for the government.

### 2. Mr. Garrity is within the class of persons for whom the FBAR requirement was designed.

The second *Bajakajian* factor, "whether the defendant fits into the class of persons for

whom the statute was principally designed," also favors the government. Mr. Garrity is *exactly*

the type of person for whom the Bank Secrecy Act was designed, *i.e.*, he is a United States

citizen who hid assets in an undisclosed financial account in a foreign county with bank secrecy

laws. *See*, *e.g.*, *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 476 n.1 (S.D.N.Y.

2017) (explaining a Liechtenstein stiftung, like the one created by Mr. Garrity, and stating "a

'stiftung[]' [is] a legal entity akin to a trust under the laws of Liechtenstein. Stiftungs have been

used regularly by U.S. taxpayers to conceal bank accounts overseas. Financial advisors and/or

legal advisors are appointed and directed to act on behalf of the stiftungs for the benefit of the

taxpayers. [] In essence, by holding bank accounts in its own name, the stiftung conceals any

connection between taxpayers and their foreign assets.").

In applying this factor, it does not matter that Mr. Garrity was not convicted of another

crime for failing to disclose the account. *See Castello*, 611 F.3d at 122 (where the Second

Circuit disagreed with the district court's conclusion that the second *Bajakajian* factor was

neutral because the defendant "was not convicted of the offenses that the [reporting] statute

aim[ed] to expose," and stating "[t]he inquiry … is whether [the defendant] was the kind of person to whom the statute is directed—as he clearly [was]"); *also United States v. Malewicka*, 664 F.3d 1099, 1105–06 (7th Cir. 2011) (finding that the defendant was "not convicted of money laundering or tax evasion, but her structuring crimes could have facilitated such conduct in just the way the statute was designed to frustrate").  Rather, the only inquiry is whether the defendant is the "kind of person" contemplated by the statute, which Mr. Garrity clearly was.

### 3.  The FBAR penalty assessed against Mr. Garrity is within the statutory maximum established by Congress.

The third *Bajakajian* factor, "the maximum sentence and fine that could have been imposed," shows that the FBAR penalty assessed against Mr. Garrity is presumptively constitutional because it is within the maximum penalty provided by Congress.  "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature," *Bajakajian*, 524 U.S. at 336, as acts of Congress are generally afforded a strong presumption of constitutionality, *see United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963).  *See also United States v. Viloski*, 814 F.3d 104, 112 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1223, 197 L. Ed. 2d 462 (2017) ("Our role in reviewing criminal forfeitures is solely to examine them for gross disproportionality; in other respects, we must defer to Congress.").

Thus, a penalty imposed within legislative boundaries is presumptively proportional.  *See Newell Recycling Co. v. U.S. EPA*, 231 F.3d 204, 210 (5th Cir. 2000) ("No matter how excessive (in lay terms) an administrative fine may appear, if the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment."); *Qwest Corp. v. Minn. Pub. Utils. Comm'n*, 427 F.3d 1061, 1069 (8th Cir. 2005) (upholding total penalty in excess of $25 million and observing that daily fines were "well within the statutory limits"); *Kelly v. U.S. EPA*, 203 F.3d 519, 524 (7th Cir. 2000) ("we can't say the fine is grossly

disproportionate to the gravity of the offense when Congress has made a judgment about the appropriate punishment"); *Wyly*, 552 B.R. at 608 ("Significantly, neither party has cited a case to the Court, nor has the Court been able to locate one through its own research, invalidating a non-forfeiture, legislative civil penalty under the Excessive Fines Clause"); *United States v. Varrone*, 554 F.3d 327, 331–32 (2d Cir. 2009) (and cases cited therein).  Here, Congress authorized a 50-percent penalty for willful violations of the FBAR requirement.  *See* 31 U.S.C. § 5321(a)(5)(C).  The penalty assessed against Mr. Garrity was within this statutory amount; accordingly, the penalty assessed against Mr. Garrity is presumptively proportional.[7]

Defendants point out that the civil FBAR penalty at issue exceeds the maximum criminal fine that may be imposed for willfully violating the FBAR requirement.  *See* ECF No. 190-1 at 18.  However, such a comparison is unnecessary in light of the fact that the civil FBAR penalty at issue is in accord with the penalty amount set by Congress.  *See* 31 U.S.C. § 5321(a)(5)(C).  Congress was no doubt aware that the potential maximum civil penalty that it set could exceed the criminal maximum fine that it also determined—if Congress were concerned it could have capped the maximum civil penalty at the same amount as the maximum criminal fine.  *See United States v. Chaplin's, Inc.*, 646 F.3d 846, 855 (11th Cir. 2011) ("But Congress has authorized both a fine and forfeiture as part of the punishment for both § 1956 and § 5324, which

---

[7]  Defendants' argument that some lesser penalty than the maximum authorized by Congress (i.e., something less than 50-percent of the account balance) should have been imposed smacks more as a challenge to the agency decision-making than an excessive fine argument under the Eighth Amendment.  Defendants did not raise an affirmative defense that the agency abused its discretion under the APA in assessing the maximum penalty, however.  *See*, *e.g.*, *Moore*, 2015 WL 1510007, at *7-11 (discussing that the IRS's determination of the penalty amount was subject to an abuse of discretion analysis under the APA).  The issue before this Court is whether the FBAR penalty assessed against Mr. Garrity was unconstitutionally excessive—it is not whether the agency acted arbitrarily or capaciously in assessing Mr. Garrity the 50-percent maximum penalty.

suggests that Congress does not consider a punishment somewhat above the statutory fine range to be excessive.") (citations and internal quotations omitted).

Nevertheless, the potential FBAR criminal penalties as compared to the civil FBAR penalty assessed against Mr. Garrity does not show that the FBAR penalty was unconstitutionally excessive. The maximum criminal fine for a stand-alone FBAR violation is $250,000. *See* 31 U.S.C. § 5322(a).[8] Merely comparing the civil FBAR penalty at issue to the potential criminal fine, however, is not an apples-to-apples comparison because it ignores the substantial term of imprisonment that could accompany a criminal conviction (5 years under § 5322(a)), which also must be considered in any Eighth Amendment analysis. *See United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (stating, "when courts have compared civil judgments with criminal penalties for the same conduct, they have considered the full criminal penalty," in holding that $729,455 in civil penalties and treble damages did not violate Eighth Amendment where maximum criminal fine was $75,000 and sentence could have included 37-46 months of imprisonment).

The potential criminal FBAR fine amount at issue here is a far cry from *Bajakajian*, where a $357,144 forfeiture was held grossly excessive in light of the maximum criminal fine for the same offense being only $5,000. *See* 524 U.S. at 339-40; *also United States v. Jose*, 499 F.3d 105, 112 (1st Cir. 2007) (observing that "the forfeiture in *Bajakajian* exceeded the maximum fine under the then-mandatory Sentencing Guidelines "by a factor of more than 70" and contrasting that to a forfeiture of "less than 4 times the maximum fine allowable under the

---

[8] If a criminal FBAR violation occurs "while violating another law" or as part of a "pattern of any illegal activity involving more than $100,000 in a 12-month period," the criminal fine goes up to $500,000 with maximum confinement of 10 years. *See* 31 U.S.C. § 5322(b).

Guidelines" that the First Circuit found not to be grossly excessive).  It can hardly be said that the civil penalty assessed against Mr. Garrity, which was less than four times the maximum fine authorized under the criminal statute, is *grossly* disproportionate as compared to *Bajakajian*, particularly when the criminal penalty also includes several years of imprisonment (and it is worth reiterating, that Congress specifically authorized the 50-percent civil penalty in addition to the criminal penalties).[9]

### 4. Mr. Garrity caused significant harm to the government by failing to timely report his foreign account.

Turning to the fourth (and final) *Bajakajian* factor, "the nature of the harm caused by the defendant's conduct," Mr. Garrity's willful failure to disclose his foreign account was significantly harmful in the eyes of Congress.  The statute authorizes a 50-percent penalty only for "willful" FBAR violations, *see* 31 U.S.C. § 5321(a)(5)(C).  This substantial maximum penalty shows that Congress believed the willful failure to file an FBAR to be a serious offense.  By contrast, the civil penalty for a non-willful FBAR violation is capped at $10,000 and subject to a reasonable cause exception.  *See* 31 U.S.C. § 5321(a)(5)(B).  The differences between the

---

[9]  Defendants do not perform an analysis under the Sentencing Guidelines, rather they simply compare the civil FBAR penalty assessed against Mr. Garrity to the maximum criminal fine. However, a quick "back of the envelope" calculation shows that the criminal punishment that Mr. Garrity may have faced under the Guidelines would not have been grossly disproportionate to the assessed FBAR penalty.  Under the Guidelines, the base offense level for a criminal violation of 31 U.S.C. § 5314 is "6 plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the funds…."  USSG §2S1.3(a)(2).  It is noteworthy that the table in §2B1.1 adds offense levels based on the amount of the funds that the defendant failed to report.  If the account held more than $1,500,000—as did Mr. Garrity's foreign account in 2005—the Guidelines add 16 offense levels.  USSG §2B1.1(b)(1)(I).  The result is an offense level of 22, which corresponds to a maximum Guideline sentence of 51 months.  *Id.*, Chapter 5, Part A.  And, a maximum Guideline fine of $150,000.  USSG §5E1.2(c)(3).  This analysis presumes that Mr. Garrity would have a Criminal History Category I.  This is not grossly disproportionate to the civil FBAR penalty that was assessed against Mr. Garrity, which was less than seven times the amount of the potential Guideline fine (not to mention the potential 51-month Guideline prison sentence).

willful and non-willful penalties reflects Congress's considered choice that a willful violation presents a serious harm to the government.

The legislative history confirms the serious nature of a willful FBAR violation.  In enacting the Bank Secrecy Act, Congress explained that "secret foreign bank accounts" enabled crime, including tax evasion, securities violations, and fraud.  H.R. Rep. No. 91-975, *reprinted in* 1970 U.S.C.C.A.N. at 4397-98.  After the Treasury later reported poor FBAR compliance, Congress announced that improving compliance was "vitally important."  S. Rep. No. 108-192, at 108.  Secretive offshore activity—like that engaged in by Mr. Garrity—has "vast" consequences and does significant harm to the integrity of the tax system.  H.R. Rep. No. 91-975, *reprinted in* 1970 U.S.C.C.A.N. at 4397.  That Congress chose not to tie the amount of the willfulness penalty to any particular amount of loss to the public fisc reflects a legislative judgment that the harm to the public fisc logically increases with the balance in the unreported account.  *See Chaplin's, Inc.*, 646 F.3d at 852 ("Congress, as a representative body, can distill the monetary value society places on harmful conduct").  The FBAR penalty therefore need not be correlated with any loss to the public fisc in a particular case.  *Cf. Mackby*, 339 F.3d at 1019 ("The government has a strong interest in preventing fraud," and the harm of false claims "extends beyond the money paid out of the treasury."); *United States v. Sperrazza*, 804 F.3d 1113, 1128 (11th Cir. 2015) (prohibited structuring "decrease[s] the likelihood the IRS would detect the underlying tax evasion and increase[s] the cost of investigating [the] crime").

These principles were applied by the Seventh Circuit in an analogous case, *Malewicka*, 664 F.3d at 1104.  There, the defendant was convicted of "structuring transactions for the purpose of avoiding bank reporting requirements."  *Id*. at 1102–03.  As part of her sentence, the district court ordered her to forfeit $279,500.  *Id*.  On appeal, the defendant claimed that the

36

forfeiture was unconstitutionally excessive because, if her crime went undetected, then the government would only have been "deprived … of information that she made certain cash withdrawals." *Id.* at 1107. In analyzing the fourth *Bajakajian* factor, the circuit court recognized that, "[w]hile it is true that her acts deprived the government of nothing but information, this characterization greatly downplays the significance of her crime." It stated that "[t]he concerns underlying her crime were significant enough that Congress enacted a statute to ensure that such information [was] collected[.]" The court highlighted that the "intent" of the reporting statute was "to aid the government's efforts to uncover and prosecute crime and fraud," and "[b]y structuring her transactions to avoid reporting requirements, [the defendant] inhibited the government's ability to effectively uncover and identify fraud." *Id.*

Similarly, in this case, Defendants imply that Mr. Garrity's failure to file an information return was insignificant. *See* ECF No. 190-1 at 15 ("The Government set forth no evidence that the penalties against Paul Garrity, Sr. bear any relationship whatsoever—rational or irrational— to actual loss or harm to the Government."). However, the loss of timely information is exactly the harm that the Bank Secrecy Act is meant to address—the loss of information harms the government because it prevents the government from timely investigating any financial crimes associated with the undisclosed foreign account. The FBAR statute does not require proof of financial harm or loss caused by the individual before assessing the civil penalty. Thus, in enacting the FBAR statute, Congress determined that the need to report a foreign account was so important, and the harm caused by willful failures was so significant, that a 50-percent penalty was appropriate. Therefore, this fourth *Bajakajian* factor—like the other three before it—favors the government. The Court should find that even if the FBAR penalty is a fine, the FBAR penalty assessed against Mr. Garrity, which was in line with the penalty authorized by Congress,

is not unconstitutionally excessive.

**D.  The FBAR Penalty in Conjunction with the Foreign Trust Penalties is Not Unconstitutionally Excessive.**

Finally, Defendants argue, in essence, that even if the FBAR penalty assessed against Mr. Garrity is not unconstitutionally excessive standing alone, the FBAR penalty is excessive when considered with the foreign trust penalties also assessed against Mr. Garrity.  *See* ECF No. 190-1 at 17-18.  They contend that the "facts and circumstances" surrounding the foreign trust penalties are the same as those surrounding the FBAR penalty.  *Id.* at 17.

The foreign trust penalties assessed against Mr. Garrity are at dispute in a case before this Court captioned, *United States of America v. Diane M. Garrity, et al.*, Case No. 3:18-cv-00111-MPS (the "Foreign Trust Penalties Case").  The foreign trust penalties were assessed against Mr. Garrity pursuant to 26 U.S.C. § 6677, for his failure to timely file Forms 3520 (Annual Return to Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts) for tax years 1996, 1997, 1998, and 2004, and for his failure to ensure that his foreign trust, Lion Rock Foundation, timely filed Forms 3520-A (Annual Information Return of Foreign Trust with a U.S. Owner) for tax years 1997 through 2008.  *See* Foreign Trust Penalties Case, ECF No. 1.  Forms 3520 and 3520-A are information returns required by 26 U.S.C. §§ 6048(a)-(c), which must be filed, generally, if a person is a United States person with a foreign trust.  Foreign trust penalties assessed under 26 U.S.C. § 6677 are mandated by statue, *see* 26 U.S.C. § 6677(a) ("the person required to file such notice or return *shall* pay a penalty…" (emphasis added), unless the taxpayer had reasonable cause for failing to file the required forms, *see* 26 U.S.C. § 6677(d).

Despite Defendants' contention that the "facts and circumstances" are the same, the FBAR penalties and foreign trust penalties assessed against Mr. Garrity address separate violations of the law—the FBAR requirement arising under the Bank Secrecy Act (Title 31) and

the obligation to report on transactions involving foreign trust arise under the Internal Revenue Code (Title 26). Presumably, Defendants contend that these penalties are inter-related because Mr. Garrity established a foreign trust only to hold his foreign account, and so the penalties all arise out of the same conduct. The Court should not entertain this argument for two reasons.

First, it is axiomatic that, "while a taxpayer is free to organize his affairs as he chooses, [] once having done so, he must accept the tax consequences of his choice, whether contemplated or not." *Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974). Here, Mr. Garrity elected to use a foreign trust to hold his foreign account; accordingly, he subjected himself to the tax obligations and consequences of having a foreign trust. Mr. Garrity did not abide by those obligations as he failed to file the information returns. His estate must live with the tax consequence of those actions.

Second, like the civil FBAR penalty, it is far from certain that foreign trust penalties are "fines" as contemplated by the Eighth Amendment. Indeed, "[t]ax penalties ... having been held to fulfill a remedial purpose are [] not subject to the Excessive Fines Clause." *Dewees*, 272 F. Supp. 3d at 100; *see also Wyly*, 552 B.R. at 613 (holding that penalties under 26 U.S.C. § 6677 for failing to report foreign trusts are not Eighth Amendment "fines"). If the foreign trust penalties are not subject to the Excessive Fine Clause because they serve a remedial purpose, then these penalties cannot be considered "stacked" on top of the FBAR penalty as they are merely meant to make the government whole.

Surprisingly, Defendants ask the Court, as part of the Eighth Amendment analysis, to "take into account that Mr. Garrity's Estate has already paid an estate tax on the Lion Rock Foundation of about one million dollars." ECF No. 190-1 at 18. Apparently, Defendants want credit for complying with their obligation to pay taxes. The fact that the estate complied with its

legal obligation to pay its fair share of taxes is not properly part of an analysis as to whether a

penalty imposed against Mr. Garrity for his decision to hide a secret foreign account is

unconstitutionally excessive.[10]

**Conclusion**

For the foregoing reasons, the Court should deny Defendants' Motion to Alter and

Reduce Judgment.

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

*/s/ Steven S. Tennyson*
STEVEN S. TENNYSON
PHILIP L. BEDNAR
CARL L. MOORE
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044
(202) 307-0872
(202) 514-5238 (fax)
steven.s.tennyson@usdoj.gov

---

[10] In any event, should the Court find Defendants' "stacking" argument compelling, which it should not, the government submits that now is not the proper time to redress this Eighth Amendment issue. Because Defendants are challenging the foreign trust penalties, and they could be successful, it would be unfair for the Court to rule that the FBAR penalty should be reduced because of the foreign trust penalties until those penalties are "fixed" by a judgment. If the Court is going to entertain Defendants' "stacking" argument, they can re-raise it in the Foreign Trust Penalties Case after the government attains a judgment, and then if the Court is convinced, the Court could reduce the foreign trust penalties. Of course, if the Court outright rejects this "stacking" argument, which it should, then such a procedure is unnecessary.

**CERTIFICATE OF SERVICE**

I certify that on August 1, 2018, I electronically filed the foregoing with the Clerk of the

Court using the ECF system, which will provide notice of the filing with all registered

participants.

_/s/ Steven S. Tennyson_
STEVEN S. TENNYSON
Trial Attorney, Tax Division
U.S. Department of Justice