# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br><br>　　v.<br><br>DIANE M. GARRITY, PAUL G. GARRITY, JR.,<br>and PAUL M. STERCZALA, as fiduciaries of the<br>Estate of Paul G. Garrity, Sr.,<br>　　　Defendants. | No. 3:15-CV-243(MPS) |

## MEMORANDUM AND ORDER

The United States of America ("the Government"), filed this suit to reduce to judgment a civil penalty the Internal Revenue Service assessed against Paul G. Garrity, Sr. under 31 U.S.C. § 5321(a)(5).[1] After a six-day trial, a jury found that Mr. Garrity had willfully failed to file a Report of Foreign Bank and Financial Accounts (commonly known as an FBAR) in 2005, in violation of 31 U.S.C. § 5314. (ECF No. 179.) The jury also found that the Government had established the assessed civil penalty ($936,691.00) was equal to 50% of the balance in Mr. Garrity's account in the year he failed to file the FBAR. (*Id.*) Before trial, the parties stipulated that, if judgment entered in favor of the Government, the Defendants would have an opportunity to file "a motion for remittitur or similar post-verdict motion." (ECF No. 154 at 2.) Accordingly, the Court entered judgment without specifying the penalty amount. The Government filed a motion to amend the judgment to include a civil penalty of $936,691.00 plus interest and a late payment penalty. (ECF

---

[1] Mr. Garrity passed away on February 10, 2008. The Government brought this action against Diane M. Garrity, Paul G. Garrity, Jr., and Paul M. Sterczala (the Defendants) as fiduciaries of his estate. I refer to Paul G. Garrity, Sr. as "Mr. Garrity" throughout this opinion.

No. 191.) The Defendants filed a motion to alter or reduce judgment. (ECF No. 190.) They assert that the maximum civil penalty for failure to file an FBAR is $100,000.00. Alternatively, they argue that the civil penalty must be reduced to "an amount that is proportional to the harm caused by the failure to file the FBAR, as required under the [Excessive Fines Clause of the] Eighth Amendment . . . ." (ECF No. 190-1 at 13.)

For the reasons set forth below, the Government's motion to alter judgment is GRANTED. The Defendants' motion to alter or reduce judgment is DENIED. The judgment will be amended to reflect a civil penalty of $936,691.00 plus statutory interest and a late payment penalty.

## DISCUSSION

### I.     The Maximum Civil Penalty for Willful FBAR Violations

By statute, the maximum civil penalty for willfully failing to file an FBAR is the greater of $100,000 or 50 percent of the balance of the account in the year for which the report was due. 31 U.S.C. § 5321(a)(5)(c). At trial, the Government proved that Mr. Garrity willfully failed to file an FBAR for 2005, and that 50 percent of the account balance in that year was equal to $936,691. Accordingly, the Government seeks to impose the full penalty available under the statute plus late fees and interest. The Defendants argue that, although the statute allows for penalties up to 50 percent of an account's balance even if that amount exceeds $100,000, the Secretary of the Treasury capped his discretion to impose civil penalties at $100,000 by regulation. *See* 31 C.F.R. § 1010.820(g).[2] I agree with the Government and hold that Congress effectively abrogated the

---

[2] Two district courts have issued decisions consistent with the position that the Defendants advocate. *See United States v. Colliot*, No. AU-16-CA-01281-SS, 2018 WL 2271381, at *3 (W.D. Tex. May 16, 2018); *United States v. Wahdan*, 325 F. Supp. 3d 1136, 1139 (D. Colo. Jul 18, 2018). The Court of Federal Claims and one district court more recently issued decisions consistent with the Government's position. *Norman v. United States*, 138 Fed. Cl. 189, 195–96 (2018); *Kimble v. United States*, No. 17-421, 2018 WL 6816546, at *15 (Fed. Cl. Dec. 27, 2018); *United States v. Horowitz*, No. PWG-16-1997, 2019 WL 265107, at *3 (D. Md. Jan. 18, 2019).

regulation capping FBAR penalties at $100,000 when it increased the maximum penalty by statute in 2004.

## A. Statutory and Regulatory History of the Willful FBAR Penalty

Congress passed the Bank Secrecy Act ("BSA") in 1970. Pub. L. No. 91-508, 84 Stat. 1114. The purpose of the BSA was "to require the maintenance of records and the making of certain reports or records where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." *Id.* § 202. The BSA delegated authority to the Secretary of the Treasury to establish record keeping and reporting requirements consistent with that purpose. *Id.* § 204; *id.* at § 241 (codified as amended at 31 U.S.C. § 5314) ("The Secretary of the Treasury . . . shall by regulation require any resident or citizen of the United States . . . who engages in any transaction or maintains any relationship . . . with a foreign financial agency to maintain records or to file reports, or both, setting forth such of the following information, in such form and in such detail, as the Secretary may require . . . ."). The Secretary promulgated final regulations implementing the BSA on July 1, 1972. 37 Fed. Reg. 6912, 6915. One provision required any person with "a financial interest in, or other authority over, a bank, securities or other financial account in a foreign country" to file a "special tax form" providing information about the account. 37 Fed. Reg. 6912, 6913. The form is commonly known as the Foreign Bank Account Report or "FBAR."

In 1986, Congress amended the BSA, granting the Secretary authority to assess civil monetary penalties "on any person who willfully violates any provision of section 5314," the code section directing the Secretary to require individuals to file an FBAR. Money Laundering Control Act of 1986, Pub. L. No. 99–570, Subtitle H, 100 Stat. 3207 (October 27, 1986) (codified as amended at 31 U.S.C. § 5321(a)). The amended statute limited civil penalties to "the greater of (I)

an amount (not to exceed $100,000) equal to the balance in the account at the time of the violation; or (II) $25,000." *Id.* § 1357 (codified as amended at 31 U.S.C. § 5321(a)(5)). Six months later, the Secretary promulgated a final rule restating the penalty section of the statute nearly verbatim. *See* Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed. Reg. 11436, 11446 (Apr. 8, 1987) (stating that the Secretary may impose a civil penalty for willfully failing to file an FBAR up to "the greater of the amount (not to exceed $100,00) equal to the balance in the account at the time of the violation, or $25,000.").[3] The penalty portion of the new regulation did not go through notice and comment procedures, appearing for the first time in the final rule on April 8, 1987. Indeed, the notice of proposed rulemaking had been published in the Federal Register in August of 1986—two months before Congress enacted the BSA amendments authorizing the Secretary to impose civil penalties on account holders. *See* Notice of Proposed Rulemaking, 51 Fed. Reg. 30233 (Aug. 25, 1986); Money Laundering Control Act of 1986, Pub. L. No. 99–570 (October 27, 1986).

In 2004, Congress amended the civil penalties for failing to file an FBAR. *See* American Jobs Creation Act of 2004, Pub L. No. 108-357, § 821, 118 Stat. 1418, 1586 (2004) (codified at 31 U.S.C. § 5321(a)(5)). The amendment increased the penalty for willful FBAR violations to the greater of $100,000 or 50 percent of the balance of the account at the time of the violation. *See* 31 U.S.C. § 5321(a)(5)(C). It also added a penalty for non-willful violations limited to $10,000. *Id.* §

---

[3] Treasury subsequently moved all regulations related to the Bank Secrecy Act to a new chapter in the Code of Federal Regulations. *See* Transfer and Reorganization of Bank Secrecy Act Regulations, 75 Fed. Reg. 65806 (Oct. 26, 2010). The regulation parroting the willful FBAR penalty was re-codified at 31 C.F.R. § 1010.820. *See id.* at 65808. Although Treasury made technical corrections along with the renumbering, it explained that any substantive changes were outside the scope of the final rule. *See id.* at 65806.

5321(a)(5)(B). The Secretary did not promulgate updated regulations to reflect the new non-willful penalty or the increased willful penalty.

### B. The 2004 Statute Abrogated the Civil Penalty Limit in the 1987 Regulation

The Defendants argue that, notwithstanding the statutorily increased penalties, the IRS remains bound by the Treasury regulation promulgated in 1987 under the pre-2004 version of the statute. According to this argument, the maximum penalty for willful FBAR violations is therefore $100,000. *See* 31 C.F.R. § 1010.820(g)(2). The Defendants assert that the amended statute establishes a ceiling on civil penalties but not a floor, and that the Secretary of the Treasury has, by retaining the old regulation, categorically established a *lower* ceiling for such penalties, limiting his own authority to the level set by Congress before the amendment. I disagree. The plain language of the 2004 amendment demonstrates Congress's intent to authorize the Secretary to impose higher penalties for willful FBAR violations without the need for additional Treasury regulations, and, as shown below, the old regulation will not bear the freight the Defendants attempt to foist upon it.

In the 2004 legislation, Congress specified that the higher penalties for willful FBAR violations would take effect immediately once the amendments were enacted. *See* Pub. L. No. 108-357, § 821(b) ("The amendment made by this section *shall apply* to violations occurring after the date of the enactment of this Act.") (emphasis added). In contrast, where Congress intended in the BSA to rely on the Secretary first to flesh out the statutory scheme by regulation, it made that intention clear. *E.g.*, 31 U.S.C. § 5314 (directing the Secretary to require citizens to either "keep records, file reports, or keep records and file reports" containing certain information "in the way and to the extent the Secretary prescribes . . . ."). The Secretary could not override Congress's

clear directive to raise the maximum willful FBAR penalty by declining to act and relying on a regulation parroting an obsolete version of the statute.

The Defendants contend that the BSA is not self-executing and the Secretary therefore lacks authority to impose FBAR penalties greater than $100,000 without first promulgating a regulation raising the limit. (*See* ECF No. 190-1 at 6.) The Defendants rely on dicta in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 ("[W]e think it important to note that the [Bank Secrecy] Act's civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone."). In that case, the Supreme Court held that the domestic reporting requirements for financial institutions under the BSA did not violate the Fourth Amendment. 416 U.S. at 66. The petitioner banks had argued that the BSA authorized the Secretary of the Treasury to impose reporting requirements that would amount to unreasonable searches. *Id.* at 64. The Court rejected their claims, holding that the banks did not have "an unqualified right to conduct their affairs in secret" and that the reporting requirements were not unreasonable. *Id.* at 67.

Nothing in *California Bankers* suggests that the Secretary must take some formal regulatory action before the *penalty provisions* of the BSA acquire the force of law. The above-quoted language simply notes that the statute itself does not establish specific reporting requirements but affords the Secretary discretion to define those requirements for holders of foreign accounts. *See California Bankers Ass'n*, 416 U.S. at 26; 31 U.S.C. § 5314. Once the Secretary establishes reporting requirements under Section 5314, though, the civil penalties in Section 5321(a)(5) attach whenever the Secretary chooses to impose them for a reporting violation, as he has in this case. 31 U.S.C. § 5321(a)(5)(A) ("The Secretary of the Treasury may impose a civil monetary penalty on any person who violates . . . any provision of section 5314."); *Id.* §

5321(a)(5)(C) ("In the case of any person willfully violating . . . any provision of section 5314—
(i) the maximum penalty . . . shall be increased to the greater of (I) $100,000, or (II) 50 percent of
[the balance in the account at the time of the violation] . . . ."). The language of the statute does
not suggest that additional regulations are necessary before the civil penalties can take effect. The
American Jobs Creation Act made no substantive changes to the FBAR filing requirement and
thus did not create any additional gaps for the Secretary to fill through regulation. *See* American
Jobs Creation Act, Pub. L. No. 108-357, §§ 801–822 (2004) (modifying the BSA and raising civil
penalties without altering the substantive FBAR requirement). As a result, the higher penalties the
Act established took effect immediately in accordance with its plain language.

## C. The Secretary Did Not Reaffirm the Lower FBAR Penalties After Congress Raised Them by Statute

There is also no reason to conclude that the Secretary intended categorically to limit his
own discretion to impose the higher penalties that Congress authorized. The pre-amble to the 1987
regulation parroting the unamended statute stated that Treasury intended to enforce the BSA "to
the fullest extent possible." 52 Fed. Reg. 11436, 11440 (Apr. 8, 1987). Further, that regulation,
now codified at 31 C.F.R. § 1010.820(g), was not promulgated after notice and comment, which
means it was, at most, an interpretive rule; it "d[id] not have the force and effect of law," *Perez v.
Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015), and it vested no rights in account holders.[4]

---

[4] Thus, one of the premises of the decision in *Colliot*, on which the Defendants rely, is incorrect.
There, the court emphasized that Treasury was bound by the 1987 regulation because it *had* been
promulgated through notice and comment and could only be repealed through notice and
comment. *Colliot*, 2018 WL 2271381, at *2–3 (W.D. Tex. May 16, 2018). As noted above, the
August 1986 notice of proposed rulemaking in the Federal Register makes no reference to the
civil penalty provision for account holders, which was not authorized by Congress until two
months later. The penalty provision was added to the final rule without notice and comment
procedures. The civil penalty provision in the 1987 regulation was at most an interpretive rule
based on a now-obsolete version of the statute.

This suggests that the reference to a civil FBAR penalty in the 1987 regulation was intended only to express the Secretary's intent to enforce the BSA with the full authority conferred on him by Congress. It is untenable to argue that the same regulation now significantly constrains the Secretary's ability to enforce the amended statute.

The Defendants assert that Treasury regulations promulgated after Congress raised the maximum penalties suggest that the Secretary tacitly reaffirmed the limits in the 1987 regulation. For example, Treasury re-arranged the chapter of the Code of Federal Regulations including the defunct FBAR penalty in 2010. *See* 75 Fed. Reg. 65806 (Oct. 26, 2010). Similarly, in 2016, Treasury amended a nearby code section to note that penalties with definite dollar amounts—which, by definition, would not include the 50 percent referenced in the 2004 amendment—would be adjusted for inflation. *See* 81 Fed. Reg. 42503 (Jun. 30, 2016). At best, these actions imply that the Secretary knew the obsolete regulation remained on the books. Other regulations in the same section are also clearly obsolete. For example, 31 C.F.R. § 1010.820(a) establishes penalties for willful reporting violations by financial institutions before 1984. The statute of limitations on such penalties—six years—expired in 1990. *See* 31 U.S.C. § 5321(b). Thus, the first subparagraph in Section 1010.820 has been defunct for nearly two decades. And in 2008 the IRS explicitly acknowledged that the earlier civil penalty regulation had not been formally repealed; the agency warned that the statute overrode the regulation and the higher statutory penalties applied. Internal Revenue Serv., Internal Revenue Manual § 4.26.16.4.5.1 (Jul. 1, 2008) ("At the time of this writing, the regulations at 31 C.F.R. § 103.57 [now re-codified at § 1010.820] have not been revised to reflect the change in the willfulness penalty ceiling. However, the statute is self-executing and the new penalty ceilings apply."); *see also id.* § 4.26.16.2 ("31 U.S.C. § 5321(a)(5) establishes civil penalties for violations of the FBAR reporting and recordkeeping requirements.");

*id.* § 4.26.16.4.5 ("There are two different statutory ceilings for willful penalty violations of the FBAR requirements, depending on whether or not the violation occurred before October 23, 2004.")[5] I cannot conclude that the Secretary categorically limited his own discretion to enforce fully the FBAR requirement by implication or inaction, particularly given the IRS's clear statements to the contrary.

The Defendants next contend that Treasury Order 180-01, originally promulgated in October 2002, reaffirmed all FBAR regulations "that were in effect or in use on the date of enactment of the USA Patriot Act of 2001 . . . ." 67 Fed. Reg. 64697-01. Treasury re-issued Order 180-01 in July 2014. *See* Treasury Order 180-01: Financial Crimes Enforcement Network (Jul 1., 2014), https://www.treasury.gov/about/role-of-treasury/orders-directives/pages/to180-01.aspx. The Defendants fail to acknowledge, however, that the order also indicates that pre-2001 regulations would remain in effect only "until superseded or revised." *Id.* As explained above, the lower FBAR penalty in 31 C.F.R. § 1010.820(g) was superseded by statute in 2004. As a result, the general reference to reaffirming earlier regulations in Treasury Order 180-01 does not support an inference that the Secretary intended to reaffirm the lower penalties in the specific regulation at issue here.

The Defendants also argue that the FBAR form itself demonstrates the Secretary's intent to impose a tighter limit on his own authority to levy civil penalties than the one Congress selected. The Privacy Act Notification on the FBAR form in effect on the date of Mr. Garrity's violation stated

---

[5] The Internal Revenue Manual is not binding authority in this case. Rather, it demonstrates the IRS's understanding that Congress had abrogated the 1987 regulation two years before the Defendants assert the Secretary implicitly reaffirmed that regulation by amending a nearby code section. *See United States v. Boyle*, 469 U.S. 241, 243 n.1 (1985) (citing the Internal Revenue Manual in describing the IRS's interpretation of a Treasury regulation).

> Civil and criminal penalties, including in certain circumstances a fine of not more than $500,000 and imprisonment of not more than five years, are provided for failure to file a report, supply information, and for filing a false or fraudulent report.

Form TD 90-22.1 (Rev. 2000). But this Privacy Act notification is inaccurate even under the Defendants' theory of the available penalties. The IRS may impose a civil monetary penalty for failing to file an FBAR "notwithstanding the fact that a criminal penalty is imposed with respect to the same violation." 31 U.S.C. § 5321(d). If the maximum civil monetary penalty were $100,000, as the Defendants assert, then the maximum combined civil and criminal penalties would be $600,000, not $500,000, and the notification still would not provide accurate notice of the full range of available monetary penalties. *See* 31 U.S.C. § 5322(b) (authorizing criminal penalties up to $500,000). As a result, it appears that the form states only the available criminal penalties. In any event, Treasury revised the form in 2012 to state the correct civil penalties as well. *See* Form TDF 90-22.1 (Rev. 2012) ("A person who willfully fails to report an account or account identifying information may be subject to a civil monetary penalty equal to the greater of $100,000 or 50 percent of the balance in the account at the time of the violation. See 31 U.S.C. section 5321(a)(5). Willful violations may also be subject to criminal penalties . . . .").[6]

Ultimately, the Defendants' reliance on these regulatory actions (or inactions) is misplaced. As noted above, the civil FBAR penalty provision in the 1987 regulation was an interpretive rule that lacked the "force and effect of law." *See Perez*, 135 S. Ct. at 1203–04. It did not create or expand account holders' rights, and it merely parroted a statute that has now been amended. No amount of "reaffirming" references of the sort Defendants point to can make it an operative limit on the Secretary's current authority. If the Secretary wanted to categorically limit his discretion to

---

[6] The Defendants do not argue that Mr. Garrity, who never filed the FBAR form, somehow relied to his detriment on the language regarding a $500,000 fine.

impose FBAR penalties above $100,000 after Congress conferred such authority on him by statute, he could do so, if at all, only through notice and comment rulemaking under the Administrative Procedure Act, clearly indicating his intent to surrender by regulation some of the authority Congress has bestowed on him. *See id.* ("Rules issued through the notice-and-comment process are often referred to as legislative rules because they have the force and effect of law."); 5 U.S.C. § 553(b) (requiring notice of proposed rulemaking to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."). It is undisputed that he has not taken such a step.

## II.     Eighth Amendment Excessive Fine

The Defendants next argue that the assessed penalty violates the Eighth Amendment's prohibition on excessive fines. U.S. Const. amend VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). On balance, I find that the penalty in this case is does not violate the Eighth Amendment.

### A. The Civil FBAR Penalty Must Be Considered Separately from the Foreign Trust Penalty

As a threshold matter, the Defendants assert that the civil penalty in this case must be considered together with the penalty assessed in another case related to the same foreign account. *See* Stipulation of Dismissal, ECF No. 42, *United States v. Garrity*, No. 18-cv-0111-MPS (D. Conn. Jan. 28, 2019) (the "Foreign Trust case"). In that case, the Government alleged that Mr. Garrity failed to file a Form 3520 to report transfers to and from the Lion Rock Foundation trust (in whose name the account was held) for 1996 through 1998 and for 2004, in violation of 26 U.S.C. § 6048(a). *See* Amended Compl. ¶¶ 12–23, *United States v. Garrity et al.*, No. 18-cv-0111. The penalty for failing to file a Form 3520 is the greater of $10,000 or 35 percent of the transaction

that triggered the reporting requirement. 26 U.S.C. § 6677(a). The Government also alleged that Mr. Garrity failed to cause the trust to file a Form 3520-A from 1997 through 2008, in violation of 26 U.S.C. § 6048(b). *See* Amended Compl. ¶¶ 15–18, *United States v. Garrity et al.*, No. 18-cv-0111. The penalty for failing to cause the trust to file a Form 3520-A is the greater of $10,000 or 5 percent of the value of the assets held in trust. 26 U.S.C. § 6677(b). In total, the IRS assessed a penalty of $1,504,388.36 for the four reporting violations with respect to the Form 3520 and the twelve reporting violations with respect to the Form 3520-A. *See* Amended Compl. ¶ 28, *United States v. Garrity et al.*, No. 18-cv-0111. On January 28, 2019, the parties reported the case settled and the Defendants filed the settlement agreement on the docket in this action. (Supplemental Information, ECF No. 203-1.) Under that agreement, the Defendants agreed to pay $850,000 and the IRS agreed to abate the balance of the penalties. (*Id.* at 1.).

The Defendants contend that, because the Foreign Trust case involved penalties for reporting violations related to the same foreign account at issue here, the total fine for purposes of the Eighth Amendment is the sum of the fines across the two cases. I disagree, even assuming that the amount assessed in the Foreign Trust case constitutes a fine for Eighth Amendment purposes. The violation here is legally and factually distinct from the violations in the Foreign Trust case. This case involves a willful failure to file Form 90.22-1 for tax year 2005. The Foreign Trust case involves failures to file Forms 3520 and 3520-A from 1996 through 2008. In each instance, it was the failure to file the forms themselves, rather than the mere existence of the underlying bank account, that triggered civil penalties, and the elements of each violation are different. Further, only one of Mr. Garrity's sixteen foreign trust reporting violations related to tax year 2005. *See* Amended Compl. ¶ 28, *United States v. Garrity et al.*, No. 18-cv-0111. The Government assessed a penalty of $111,123.04 for that violation. *Id.* But the IRS later abated $654,388.36 in penalties,

and the parties' settlement agreement indicated that the Defendants' payment would be "applied to whichever of the Foreign Trust Penalty Liabilities the IRS deems in its discretion to be in its best interests." (ECF No. 203-1 at 1.) It is unclear, then, whether *any* of the payment was allocated to the penalty for tax year 2005. In short, the penalties in the Foreign Trust case relate to different conduct in different years than the present case. As a result, I decline to consider those penalties in analyzing the penalty in this case under the Eighth Amendment.

### B. The Assessed Penalty Is Not Excessive Under the Eighth Amendment

The Defendants argue that the penalty in this case is "grossly disproportional" to Mr. Garrity's violation and must be reduced.[7] Courts assessing the proportionality of a fine under the Eighth Amendment are guided by four factors "distilled" from the Supreme Court's analysis in *United States v. Bajakajian*, 524 U.S. 321 (1998):

> [1] the essence of the crime of the defendant and its relation to other criminal activity, [2] whether the defendant fit[s] into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the defendant's conduct.

*United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010). I consider each of these factors below and conclude that the penalty in this case is not excessive.

### 1. The Violation and Its Relation to Other Criminal Activity

Defendants challenging a fine under the Eighth Amendment bear the burden of demonstrating that the fine is unconstitutional. *Castello*, 611 F.3d at 120 ("The burden rests on the defendant to show the unconstitutionality of the forfeiture.") The Defendants have not carried that burden. They have offered no explanation for why Mr. Garrity opened the foreign account, nor

---

[7] The Government argues that a willful FBAR penalty is not a "fine" subject to scrutiny under the Eighth Amendment. Because I conclude that the penalty in this case does not in any event violate the Eighth Amendment, I do not address the Government's contention.

have they identified the source of the money in it. Further, although the Government was not required to prove that Mr. Garrity engaged in other illicit activity related to his foreign account, there was evidence at the trial that, at the very least, raises serious questions about his and his sons' activity related to the account. For example, the account was opened in Liechtenstein under the name of a trust known as a Liechtenstein Stiftung. In 2008, Liechtenstein was one of three countries identified as tax havens by the Organization for Economic Development and Cooperation. *See* Jane G. Gravelle, Cong. Research Serv., R40623, *Tax Havens: International Tax Avoidance and Evasion* 5 (2015). The Joint Committee on Taxation reported that U.S. citizens frequently utilized trust accounts in Liechtenstein to shield their assets from discovery by authorities and evade taxes. *See* Joint Committee on Taxation, *Tax Compliance and Enforcement Issues with Respect to Offshore Accounts and Entities* 41 (JCX-23-09), March 30, 2009.

There was also evidence that Mr. Garrity and his sons made efforts to keep the account's existence a secret. Two of his three sons who testified at trial invoked their Fifth Amendment rights as to all questions about the account, including questions about a trip to Liechtenstein to make large cash withdrawals from the account. The third son testified that, upon flying home from that trip, he gave his cash to his brothers out of concern for U.S. currency transaction reporting requirements, only to recover the cash once they cleared customs. (*See* ECF No. 196-1 at 2–5.) While the jury was not required to make any findings about the suspicious efforts to maintain the secrecy of the account, the Defendants have not borne their burden of showing that the violation had nothing to do with criminal activity. *Contrast Bajakajian*, 524 U.S. at 337–38 ("[Bajakajian's] violation was unrelated to any other illegal activities. The money was the proceeds of legal activity and was to be used to repay a lawful debt."). The trial evidence also would likely have supported a finding—had the government sought one—of FBAR violations every year since 1989 when the

account was created. *See Castello*, 611 F.3d at 121–22 (distinguishing *Bajakajian* on the ground that "Castello's crime is far more serious than Bajakajian's" in part because "Castello failed to file the required CTRs 'thousands' of times . . . , whereas Bajakajian committed a single offense . . . ."). Mr. Garrity never disclosed the account, and the absence of criminal charges arising from his violation may owe largely to his success in concealing it during his lifetime. That success also likely weakened the Government's ability to investigate and uncover potentially unlawful activity related to the account.[8] All of this suggests that Mr. Garrity's conduct in this case went to the core purpose of the FBAR filing requirement under the BSA. *See California Bankers Ass'n*, 416 U.S. at 76 ("[T]he recordkeeping and reporting requirements of the Bank Secrecy Act are focused in large part on the acquisition of information to assist in the enforcement of criminal laws.").

This case is thus unlike *Bajakajian*, where, after a bench trial, the district court expressly "found that the funds were not connected to any other crime and that respondent was transporting the money to repay a lawful debt." *Id.* There was no similar finding in this case about the source of the money in Mr. Garrity's account or its intended purpose, and, as suggested above, the evidence would not have supported such a finding.

## 2. Whether the Defendant Fits into the Class of Persons for Whom the Statute was Designed

The purpose of the BSA is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings . . . ." 31 U.S.C.A. § 5311. The FBAR penalty targets individuals who fail to disclose their interest in foreign accounts, preventing the Government from identifying and investigating possible tax evasion or

---

[8] Even if the Government found evidence of criminal activity after it learned of the account, it could not have brought criminal charges against Mr. Garrity after his death. *See United States v. Libous*, 858 F.3d 64, 66 (2d Cir. 2017).

criminal activity. As explained above, Mr. Garrity fits squarely into the class of persons for whom the BSA was designed.[9]

In early 2008, shortly before Mr. Garrity's interest in the Liechtenstein account was formally disclosed to the U.S. Government for the first time, the IRS identified Liechtenstein as a significant haven for tax evaders. Gravelle, *supra*, at 5. The Joint Committee on Taxation noted that Liechtenstein account holders had avoided detection for the past decade in part by failing to comply with the FBAR requirement or file Forms 3520 or 3520-A. *See* Joint Committee on Taxation, *supra*, at 41. In short, Mr. Garrity willfully failed to report his Liechtenstein trust at precisely the time when the Government was most concerned about tax evasion schemes that used such accounts. The reporting requirements under the BSA are intended to facilitate the Government's ability to gather information and investigate crimes and tax evasion. Mr. Garrity's violation frustrated that information-gathering purpose.

### 3. The Maximum Sentence and Fine that Could Have Been Imposed

The maximum criminal penalty for willfully failing to file an FBAR is a fine of $250,000 and five years' imprisonment. 31 U.S.C. § 5322(a). If the violation is "part of a pattern of any illegal activity involving more than $100,000 in a 12-month period," the penalty increases to a $500,000 fine and ten years' imprisonment. 31 U.S.C. § 5322(b). Civil penalties are limited to the greater of $100,000 or 50 percent of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5). The Defendants argue that the civil penalty assessed in this case was significantly higher than the maximum criminal penalty available, weighing in favor of a finding that the civil penalty was excessive. Although they are correct that the civil penalty here exceeds

---

[9] I acknowledge that Mr. Garrity is not himself a defendant in this action. The named Defendants were sued as fiduciaries of Mr. Garrity's estate. I treat Mr. Garrity as the defendant for purposes of this analysis.

the maximum available criminal fine, this circumstance does not weigh in their favor when all of the relevant circumstances are considered.

The Supreme Court in *Bajakajian* and the Second Circuit in *Castello* examined the maximum penalties that could be imposed in order to gain insight into the severity of defendants' offenses in the eyes of Congress and the Sentencing Commission. In *Bajakajian*, the Court compared the maximum criminal penalty available for a substantive reporting violation, 31 U.S.C. § 5316, with the total amount the Government sought through a separate criminal forfeiture count. 18 U.S.C. § 982(a)(1). The maximum fine for the substantive violation—and the one imposed by the sentencing judge—was $5,000 under the then-binding U.S. Sentencing Guidelines—71 times lower than the amount the Government sought through forfeiture. The Court reasoned that the relatively low fine for the substantive violation "confirm[ed] a minimal level of culpability." *Bajakajian*, 524 U.S. at 339.

In *Castello*, the Second Circuit considered the Guidelines penalties as well, noting that "statutory penalties reflect severity in a general way, but the applicable Guidelines are more indicative." *Castello*, 611 F.3d at 123. There, the court focused on the fact that the Guidelines imprisonment range exceeded the statutory maximum as an indication that the defendant's conduct was quite severe. *Id.* ("[W]hile the maximum Guidelines fine may not exceed the statutory maximum, the Guidelines range of imprisonment was far greater.") Here, by contrast, the parties have offered no input on the appropriate Guidelines calculation. The applicable Guideline, U.S.S.G. § 2S1.3, would establish an offense level of 6 (if funds in the account were obtained legally and were to be used for a lawful purpose) or 24 (if the misconduct was part of a pattern of unlawful activity). The Guidelines fines at these offense levels could range from $1,000 to

$200,000. In the end, though, there is insufficient information in the record for the Guidelines to provide useful insight into the severity of the offense.

That leaves the applicable statutes, which, as noted, set a maximum fine of $250,000 for a simple criminal FBAR violation, an amount more than one quarter of the civil penalty sought by the Government. At least one court has found that a ratio of more than 4:1 between a Guidelines maximum and a criminal forfeiture did not meet the "grossly disproportional" standard set in *Bajakajian*. *United States v. Jose*, 499 F.3d 105, 112 (1st Cir. 2007) ("[T]he forfeiture at issue here is less than 4 times the maximum fine allowable under the Guidelines, whereas the forfeiture in *Bajakajian* exceeded the then-mandatory Guidelines by a factor of more than 70. This undermines Jose's argument that the forfeiture order is grossly out of proportion to the gravity of his offense.")

Further, unlike the criminal fines in *Bajakajian* and *Castello*, the criminal fines for an FBAR violation do not capture Congress's full assessment of the severity of the conduct. Here, Congress explicitly determined that the civil and criminal FBAR penalties may stack. 31 U.S.C. § 5321(d). Congress thus expressly intended that any criminal penalty could be imposed on top of the assessed civil penalty for identical conduct, and specifically calibrated the amount of the total available monetary penalty at a high level, i.e., $250,000 plus the greater of $100,000 or 50 percent of the account's value. That is a strong indicator that Congress viewed an FBAR violation— especially one involving an account with a large balance—as severe criminal conduct warranting heavy sanctions. *See Bajakajian*, 524 U.S. at 336 ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."). In this case, of course, unlike in *Bajakajian* and *Castello* where the Government sought and obtained criminal fines, the Government did not utilize the full measure of its combined criminal and civil authority. As noted,

that may be because Mr. Garrity passed away before the Government learned of the account. At least in the eyes of Congress, then, Mr. Garrity's conduct amounted to serious wrongdoing.

### 4. The Nature of the Harm Caused by the Defendant's Conduct

Finally, the Defendants have not carried their burden of demonstrating that the penalty is excessive given the nature of the harm in this case. The evidence showed that Mr. Garrity opened the Liechtenstein trust account in 1989. (Gov't Ex. 60 at 4.) He failed to report his interest in the account every year for almost two decades. The Defendants argue that a reporting violation is not sufficiently serious to warrant such a substantial penalty. The Second Circuit has held that full forfeiture of $12,012,924.31 and defendant's equity interest in his home did not violate the Eighth Amendment where the defendant was convicted of a reporting offense. *Castello*, 611 F.3d at 123–24. In *Castello*, the defendant repeatedly failed to file the requisite currency transaction reports for his check-cashing business. *Id.* Although he was charged with other crimes, including tax evasion and money laundering, he was acquitted of all but the reporting violation. The Second Circuit explained that, although he was only convicted of reporting violations, the harm his misconduct caused was significant because it prevented the government from uncovering or prosecuting crimes committed by others. *Id.* at 124.

Here, Mr. Garrity failed to report his interest in a foreign account for almost two decades and his violations prevented the government from investigating and prosecuting other potential crimes. *See supra* Section II.B.1. His violation was serious and may have helped to conceal other misconduct. Given the delay in uncovering the violation, the Government may never glean a full picture of Mr. Garrity's assets abroad. Given the number of years the undisclosed account remained open, and the evidence at trial of substantial balances in several of those years, there is potential that the violation deprived the Government of taxes on a substantial amount of investment

gains.[10] Again, it is impossible to be sure about this, precisely because Mr. Garrity's failure to disclose the account during his lifetime prevented the Government from fully investigating it. As it was, the Government expended significant resources investigating his foreign account. (*See generally* ECF Nos. 121 & 138 (evidentiary motions referencing IRS examinations preceding this lawsuit); Defs. Proposed Trial Exhibits 549–52 (interviews of Mr. Garrity's sons during an IRS examination and deposition of the IRS examiner).)[11] Under the circumstances, the Defendants have not shown "that neither the Government nor anyone else suffered harm" as a result of the violation, (ECF No. 190-1 at 18), and I cannot find that the civil penalty is "grossly disproportional" to the harm.

## III.     Interest and Late Payment Penalties

The Government also asserts that it is entitled to a late payment penalty and interest. The Defendants do not contest this or the amount of the late payment penalty and interest sought by the Government. Federal agencies must assess a late payment penalty "of not more than 6 per cent per year for failure to pay part of a debt more than 90 days past due." 31 U.S.C. § 3717(e)(2). Agencies must also assess interest at a rate fixed by regulation. 31 U.S.C. § 3717(a)-(c); *United States v. Texas*, 507 U.S. 529, 536 (1993) ("Section 3717(a) requires federal agencies to collect prejudgment interest against persons and specifies the interest rate.") Interest does not compound,

---

[10] Given that the BSA in part targets tax evasion, the relevant marginal income tax rates also help place the civil FBAR penalty in context and inform the analysis of the severity of Mr. Garrity's offense. When the BSA was passed, the highest marginal tax rate was 70%. Tax Pol'y Ctr., Historical Highest Marginal Income Tax Rates (Jan. 18, 2019), https://www.taxpolicycenter.org/statistics/historical-highest-marginal-income-tax-rates. The highest marginal tax rates between 1986 and 2008 ranged from 28% to 50%.

[11] *See United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, 1373 (M.D. Fla. 2018) (finding a 50 percent willful FBAR penalty to be remedial, rather than punitive, because it compensated the Government for the "heavy expense of investigation" and citing cases upholding 50 percent assessments on the theory that they compensate the Government for investigation costs).

31 C.F.R. § 901.9(b)(2), and it does not accrue on late payment penalties, 31 U.S.C. § 3717(f). Interest and late payment penalties begin to accrue on the day the assessment is first mailed to the debtor. *See* 31 U.S.C. § 3717(d); I.R.M. § 4.26.17.4.3 (May 5, 2008); I.R.M. § 8.11.6.2 (Sep. 27, 2018).

The interest rate in this case is 1 percent. *See* Rate for Use in Federal Debt Collection and Discount and Rebate Evaluation, 77 Fed. Reg. 68886-03, 2012 WL 5561505 (Nov. 16, 2012). Thus, the judgment will include (1) interest of $9,366.91 per year ($25.66 per day) and (2) a late payment penalty of $56,201.46 per year ($153.98 per day).[12] The late payment penalty and interest will continue to accrue until the FBAR penalty is paid.

## CONCLUSION

To summarize, the maximum civil penalty for willfully failing to file an FBAR is the greater of $100,000 or 50 percent of the account balance at the time of the violation—in this case $936,691. 31 U.S.C. § 5321(a)(5). This amount is proportional to the harm caused by Mr. Garrity's violation. The Government is also entitled to late payment penalties and interest under 31 U.S.C. § 3717. Accordingly, the Government's motion to alter judgment (ECF No. 191) is GRANTED and the Defendants' motion to alter and reduce judgment (ECF No. 190) is DENIED. The Clerk shall enter judgment for the Plaintiff in the total amount of $1,330,460.50, consisting of the civil penalty of $936,691, interest of $56,252.78, and a late payment penalty of $337,516.72.

---

[12] The IRS assessed the FBAR penalty in this case against Mr. Garrity's estate on February 26, 2013. (Penalty Assessment Certification, ECF No. 191-2 at 3.) The Defendants admitted that the IRS sent a notice and demand for payment the same day. (Compl., ECF No. 1 § 28; Answer, ECF No. 9 § 28.) As of February 28, 2019, six years and two days after notice was mailed, the total interest due was $56,252.78 and the total late payment penalty was $337,516.72.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              February 28, 2019